STATE, Respondent, v. HOYT, Appellant.*

*October 4—October 29, 1963.*

For the appellant there was a brief by *Max Raskin,* attorney, and *Herbert S. Bratt* of counsel, both of Milwaukee, and oral argument by *Mr. Raskin.*

For the respondent the cause was argued by *William A. Platz* and *Robert D. Martinson,* assistant attorneys general, with whom on the brief were *George Thompson,* attorney general, and *William J. McCauley,* district attorney of Milwaukee county. *Aladin A. De Brozzo,* assistant district attorney, also argued.

---

[18] *Crooker v. California, supra.*
* Motion for rehearing granted.

WILKIE, J.　Three major issues are presented on this appeal. They are:

1. Under all the circumstances of this case, was Mrs. Hoyt's confession, which was admitted into evidence, the voluntary product of a free and unconstrained will?

2. Was there a reasonable basis in the evidence to permit the trial court to submit a possible verdict of manslaughter, pursuant to sec. 940.05 (1), Stats.?

3. Was certain information admitted into evidence in violation of the due-process clause of the Fourteenth amendment, U. S. Const., because such information was obtained as a result of an illegal search and seizure?

The events leading up to the shooting on May 28, 1962, are undisputed. On that day the victim, a Milwaukee policeman, did not have to go to work. He spent the morning and part of the afternoon playing golf with a friend. In the late afternoon, while on a shopping trip, Mrs. Hoyt noted the friend's car parked outside a tavern. She went in and found her husband sitting at the bar with his golfing friend. After exchanging a few words, Mrs. Hoyt left the tavern and picked up their son from school, returned him to their home, and then went back to the tavern to join her husband. At the tavern the deceased was grossly insulting to his wife. A patron remarked to him that he had a nice wife. He replied, in effect, that if he would like her, why didn't he take her. He remarked that when his wife was born they should have thrown her away and kept the afterbirth. He also made the remark that, in effect, the sorriest day of his life was the day of his marriage to the defendant.

The Hoyts left the tavern about 5:30, picked up some sandwiches and malted milks at a food stand near their home. They returned to their house and ate a light supper. Shortly thereafter the defendant went to her husband, who was lying on a couch in the living room. She sat next to him on the couch. She asked him whether or not they could live some other kind of life. According to her testimony, he

replied, "You can live any kind of life you want—I don't care." Mrs. Hoyt testified that he said he would sell the house, take their son with him, and leave town. She told him, "Don't talk so foolish." In response to this remark, Mrs. Hoyt testified that the deceased said, "Get my knife, cut me; get my gun, shoot me; I don't care." Mrs. Hoyt responded by saying, "Don't talk so stupid." The defendant testified that at this point the deceased knocked her off the couch to the floor with his legs. He leaned forward, put his hand upon her head and applied pressure, ostensibly to attempt to push her head down to the floor. When he released this pressure she then crawled up to the couch, leaned over him and suggested that he go to bed. He replied to this, "Why don't you go to hell?" He put his hand on her face and pushed her backward. What happened then was described by the defendant as follows:

"Well, when he did this [pushed her backward] I just lost my balance and I ended up away from him, you know, I just fell this way. And then I got up and walked out into the hall and I just wanted to get out of the room and I just felt like I wasn't there—well, it was real foggy, like you can't even look out of the side of your eyes, or something. And I walked into the hall, and, well, I just was afraid to be in there, I didn't know what to do. I couldn't go in the kitchen because he was there and so he could see, and I was afraid he would come after me if I went in the kitchen. And when I was thinking this—I was already past this bedroom, and so I turned into Rusty's room—it was on the side of me and I just turned in and I walked in Rusty's room and I was standing there and I was just staring straight ahead as I walked in. And I saw the door open, it has a mirror on it, and I took my hand and I was going to close the door, and I looked up and my eyes saw this gun. I don't feel like I even reached for it, it just seemed like I was drew to touch that gun and—I mean, in a fog, I wasn't thinking, I wasn't planning, I wasn't doing anything.

"I just reached this gun and I had it in my hands and some leather covering of some sort fell down and I was look-

ing at this gun in my hands, and I was just foggy and I was staring at this gun. And I walked out two steps, I think it was, and I'm out of this room and I was in the hall, and as soon as I realized I was in the hall and I had that gun I quick put it in back of me. And I heard a little noise outside and I walked, turned—the hall is so small—I turned to the living room and Bill could see me and I was standing with my hands behind my back. And he said 'Have you got a knife—cut me. You got my gun?' And when he said 'gun' I just didn't say anything, and he was coming at me and I put the gun in front and he laid back down and he said 'Shoot, it's not loaded—shoot.'

"And I just was froze there, and I was standing there and he said 'What's the matter, what's the matter now,' he said, 'come on, bitch,' he said, 'come on,' he said, 'shoot,' he said 'come on, you bitch, shoot.' And I said 'quiet,' and he said 'shoot, I don't care, I don't care about you, I don't care about kids, I don't care about anything, shoot, shoot, shoot, shoot, shoot!' And his face came at me and it was all red and contorted and I stepped back and it shot, and it was dull, and I thought 'What is that?' and I saw Bill, and at first it looked like he was mad again, but then his face crumpled and I laid down and I said 'Bill, Bill, Oh Bill!' "

The events in the home occurred some time between 6 and 7 p. m. After the shooting Mrs. Hoyt brought her child in from outdoors, fed her dog, and then went to her parents' home in the city of Milwaukee. When the defendant entered, her mother felt that she looked as though she were in an extreme state of shock. When her mother asked her whether she had been fighting with her husband again, she was vague and unresponsive. She simply asked for a drink of something and her mother gave her beer. Shortly thereafter, her father returned to his home. When he saw his daughter, he testified that he thought she had had another serious argument with her husband and he planned to go to Mrs. Hoyt's home and attempt still another reconciliation. As he attempted to go on this mission, Mrs. Hoyt said to her mother, in effect, "don't let him go, it's too late." Her

father replied, in effect, that as long as there was some spark of life there was still hope. Mrs. Hoyt replied, "There is no hope." From the tone of her voice and her general manner, her parents concluded that her husband was dead. When they asked her if this were the case, she replied that she had shot him. Both parents testified that during this interchange she kept repeating over and over, in effect, "He humiliated me so, he humiliated me so."

The marriage of the victim and the defendant had been stormy. They were married in 1955. This was her second marriage. Within the year she had one child, a boy named Russell. The record reveals that during the three years immediately prior to the shooting, on numerous occasions the deceased subjected both Mrs. Hoyt and her son to physical abuse and psychological humiliation. The neighbors testified that on occasions they were awakened in the night by Mrs. Hoyt's pleas that her husband stop beating her. They would observe her on the following day, bearing the indelible marks of a physical beating. Other witnesses testified that upon occasion, if their small son, who was at the time four or five years old, would talk out of turn or would spill food at the table, his father would respond by striking him on the hands with eating utensils, or by striking him in the stomach with his fist with sufficient force to knock out the boy's breath. On one occasion a witness testified that the deceased beat his son over the head with a toy pistol when the child did something that offended him and that those present in the room had to pull the father off the small boy. Another witness testified that when, during the course of a ball game, the young boy failed to display the physical attributes of an adolescent or grown man, the father subjected him to psychological humiliation.

Mrs. Hoyt's parents testified that on numerous occasions their son-in-law had beaten his wife and child. She would

come to them, telling them of these events and her father would tell the deceased that if he behaved this way again he would have to fight him as well. However, on each occasion, the parents would attempt to effect a reconciliation between Mrs. Hoyt and her husband. On at least one occasion during which the deceased had been beating his wife, the Milwaukee police were summoned. The testimony revealed that at this time the deceased's superior officer gave him a dressing down in the presence of his wife for such conduct. Testimony also revealed that the deceased was sexually indifferent toward his wife. Although Mrs. Hoyt desired another child as a means of shoring up the family relationship and as a playmate for their other child, when she would suggest that they have intercourse he would reply, in effect, "What are you, some kind of animal?" or would ignore her request entirely.

After her daughter had told her of the shooting, Mrs. Hoyt's mother called the Milwaukee police department and told them that there had been an accident at Mrs. Hoyt's home, in the course of which Mrs. Hoyt had shot her husband. Upon receiving this call, the Milwaukee police immediately dispatched an ambulance squad to Mrs. Hoyt's home and a police squad to the home of Mrs. Hoyt's parents, the Scheutzes. Mrs. Hoyt was taken by squad car to the police station and while en route was advised of her right not to say anything that might tend to incriminate her. She was silent until she arrived at the station.

What happened during the period of interrogation at the station and the events surrounding the making of her written confession are strenuously contested on this appeal since the confession was received in evidence over defendant's objection that this was in violation of her rights under the due-process clause of the Fourteenth amendment, U. S. con-

stitution.[1]  This raises the first major issue to be considered on this appeal.

## The Confession.

Mrs. Hoyt's confession, a three-page document in her own handwriting, was completed at 4:30 a. m. on the following morning.  In her confession she stated:

"I Dona Hoyt voluntarily state as follows to Kenneth Hagopian [formal part omitted]

"I've been married to William Hoyt for the last seven years.  I have one lovely boy and during the past three years I've desperately wanted more children.  Instead of helping it Bill got colder & colder in his attitudes to me and never seemed to desire intercourse with me.  He spent most of his off nights sleeping on the davenport.  I asked him if our sex life could improve then he'd call me 'animal' or just say 'yah yah.'  He made fun of my appearance in front of people.  I was afraid of him because he had beat me many times.  He seemed proud of the fact that he could 'floor me' as he called it.  We had several police calls for family trouble through the years.  He wasn't interested in taking us to the movies or watching TV with us.  When I tried to talk with him he'd either fall back to sleep on the davenport or else be reading the paper.  On his off days he was always gone.  Monday he went golfing and I picked him up at the tavern.  There he made insulting remarks to me in front of everybody.  Saying 'who wants that old bag?' and 'It was sorriest day in his life when he married me[.]'  A friend said you've got a nice wife and he said 'go on Take her' He'd say to me in front of everyone 'If you don't like it get a transfer'  On arriving home we argued a little more then he was going to sleep on the floor again after spending Sunday night there I tried to make him get up and go to bed and he started swinging his arms at me and I was trying to talk nice to him and it was the final humiliation.  He said to get out &

---

[1] Article XIV.  ". . . nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

some other things I can't remember for some reason I went to my boys room. The closet door was open I saw the gun on the shelf, reached for it put it behind my back and walked into the living room thinking I'd scare him into stopping insulting me. He looked up & (it must have been my expression) because he said 'What you got, a knife. Go ahead and cut me' I said 'no' & he said 'Get my Gun' and I put it in front of me. He started to get up. I had both hands on the gun. I know he'd have beat me good. The gun went off.

"I don't remember pulling the trigger. I didn't want to kill him. I think it must have been the beer I drank and he must have had a lot to tell me to get the gun. I only wish he'd never have left a loaded gun in the house. If I've left out anything its because I'm so tired & sick. [Formal part omitted.]"

This confession was admitted into evidence after the court made a *prima facie* determination that such confession was "testimonially trustworthy." In his instructions to the jury on the completion of the testimony, the trial court instructed the jury that they were to consider the evidentiary value of the confession if, and only if, they considered it to be a statement voluntarily made.

We must apply federal constitutional standards in determining whether or not the confession was received in violation of the due-process clause of the Fourteenth amendment, U. S. constitution. The scope of review of our appellate court in determining whether or not a particular confession was coerced was marked out in *Culombe v. Connecticut*.[2] In that case the court, through Mr. Justice FRANKFURTER, outlined the scope of our review in terms of a three-stage process. First, there is the task of finding the "historical" or physical facts—the external events surrounding the confession. Secondly, there is the job of re-creating the defendant's psychological response to those facts. Thirdly, we must apply legal standards to the first two findings.

---

[2] (1961), 367 U. S. 568, 81 Sup. Ct. 1860, 6 L. Ed. (2d) 1037.

As to the events which transpired in the police station, if the testimony of the witnesses is in conflict, we must resolve those conflicts in favor of the view which supports the trial court's determination that the confession was voluntary and which supports the jury's finding that the confession was voluntary.

In making our assessment of the defendant's psychological response to her circumstances and applying the legal standards of voluntariness to this response, we may consider only those physical happenings which are supported by uncontradicted testimony. However, on the question of the defendant's psychological response to these factors and on the question of the constitutional significance of such response, we are free to make an independent redetermination of the findings of both the trial court and the jury.[3]

Before considering the merits of the appellant's claim it is important to emphasize the rationale for excluding a confession which is deemed to have been coerced. The state maintains that even if we conclude that Mrs. Hoyt's confession was not the product of a free and voluntary will, there is no need to order a new trial. The state contends that Mrs. Hoyt took the stand and upon direct examination testified to virtually the same facts which were stated in her confession. Since this testimony was obtained in open courtroom under the protection of the court and under guidance of counsel, the state concludes that her confession cannot be regarded as being untrustworthy. If the rationale for excluding coerced confessions was our fear of their low evidentiary value, the state's contention would have merit. However, the rationale for excluding involuntary confessions is not predicated upon their testimonial untrustworthiness. That this is so can best be demonstrated by an examination of the reasoning of the United States supreme

---

[3] *Culombe v. Connecticut, supra.*

court in recent confession cases. In *Spano v. New York* [4] the court said:

"The abhorrence of society to the use of involuntary confessions does not turn alone on their inherent untrustworthiness. It also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves. Accordingly, the actions of police in obtaining confessions have come under scrutiny in a long series of cases."

Again, in *Blackburn v. Alabama* [5] the court said:

"It is also established that the Fourteenth amendment forbids 'fundamental unfairness in the use of evidence whether true or false.' . . . Consequently, we have rejected the arguments that introduction of an involuntary confession is immaterial where other evidence establishes guilt or corroborates the confession. . . .

"But neither the likelihood that the confession is untrue nor the preservation of the individual's freedom of will is the sole interest at stake. . . . Thus a complex of values underlies the stricture against use by the state of confessions which, by way of convenient shorthand, this Court terms involuntary, and the role played by each in any situation varies according to the particular circumstances of the case."

In *Rogers v. Richmond* [6] the court, speaking through Mr. Justice FRANKFURTER, said the critical test as to the voluntariness of the confession is:

"[W]hether the behavior of the state's law enforcement officials was such as to overbear petitioner's will to resist

[4] (1959), 360 U. S. 315, 320, 79 Sup. Ct. 1202, 3 L. Ed. (2d) 1265.
[5] (1960), 361 U. S. 199, 206, 207, 80 Sup. Ct. 274, 4 L. Ed. (2d) 242.
[6] (1961), 365 U. S. 534, 81 Sup. Ct. 735, 5 L. Ed. (2d) 760.

and bring about confessions not freely self-determined. . . ."
(p. 544.)

Involuntary confessions are excluded—

". . . not because such confessions are unlikely to be true
but because the methods used . . . offend an underlying
principle in the enforcement of our criminal law : that ours
is an accusatorial and not an inquisitorial system—a system
in which the State must establish guilt by evidence inde-
pendently and freely secured and may not by coercion prove
its charge against an accused out of his own mouth."
(p. 540.)

And finally, in *Haynes v. Washington* [6a] the court, at
page 514, expressed its conclusion that the confession was
coerced in these terms :

". . . given the unfair and inherently coercive context in
which made, that choice [to make a confession] cannot be
said to be the voluntary product of a free and unconstrained
will, as required by the Fourteenth Amendment."

Thus we see that the evidentiary reliability of a confession
is not the critical factor of its admissibility under the
Fourteenth amendment. Under the present-day rationale of
coerced confessions, the focus is upon the defendant, and
upon his psychological response to the circumstances sur-
rounding him during interrogation. If this court, upon an
independent determination of the record, concludes that the
defendant was overborne by various interrogation techniques
so that his confession represents a surrender to overpower-
ing psychological pressure, then we must reverse the convic-
tion regardless of the evidentiary value of the confession.
The exclusion of the confession is a means of checking in-
quisitorial interrogation techniques which are incompatible
with our commitments to human dignity and responsibility

[6a] (1963), 373 U. S. 503, 83 Sup. Ct. 1336, 10 L. Ed. (2d) 513.

expressed in the due-process clause of the Fourteenth amendment.

Therefore, to the extent that the test for admissibility of a confession within our jurisdiction is restricted to the testimonial trustworthiness of such confession,[7] such test is constitutionally inadequate. Henceforth, in making a *prima facie* determination of whether or not admissibility of a confession ought to be considered by the jury, the trial court must not only ask himself, Does the confession have evidentiary trustworthiness, he must also ask himself, Was it likely this confession was obtained as a result of inquisitorial police interrogation? In the instant case, it does not appear that the trial judge took this latter factor into consideration when he made his *prima facie* determination that the issue of admissibility of a confession could go to a jury. However, in his instructions to the jury, he framed their inquiry in terms of a determination that the confession was a product of a voluntary will. Therefore, we find no prejudicial error in the trial court's original determination that the confession might go to the jury.

We are obliged, nevertheless, to make our own independent determination of the voluntariness of the confession based on a broad and independent review, made as prescribed in *Culombe, supra.*

Thus, we turn now to a consideration of the merits of the defendant's claim that her confession was not the voluntary product of a free and unconstrained will.

In determining whether a confession is voluntary, the United States supreme court has cited various factors which it has deemed relevant.

. (1) The length of the period of interrogation.[8]

---

[7] *Pollack v. State* (1934), 215 Wis. 200, 253 N. W. 560.

[8] *Culombe v. Connecticut, supra; Fikes v. Alabama* (1957), 352 U. S. 191, 77 Sup. Ct. 281, 1 L. Ed. (2d) 246; *Ashcraft v. Tennessee* (1944), 322 U. S. 143, 64 Sup. Ct. 921, 88 L. Ed. 1192.

(2) The psychological condition of the suspect at the time of interrogation.[9]

(3) Whether promises of aid or leniency as a reward for "co-operation" were made by officials in charge of the interrogation.[10]

These factors are not to be mechanically added and subtracted, nor are they to be deemed as exclusive. In making our determination of the voluntariness of the confession, we must focus upon the "totality of circumstances" surrounding the suspect's entire transaction with the police during the interrogation period.[11]

The entire interrogation leading to confession is viewed more closely when the record reveals that at the time that an interrogation leading to confession began the police already had in their possession substantial evidence tending to confirm the suspect's guilt. Under these circumstances the court is willing to resolve ambiguities surrounding the various relevant factors in favor of the inadmissibility of a confession. As the United States supreme court noted in *Haynes v. Washington, supra,* at page 519:

"While history amply shows that confessions have often been extorted to save law enforcement officials the trouble and effort of obtaining valid and independent evidence, the coercive devices used here were designed to obtain admissions which would incontrovertibly complete a case in which there had already been obtained, by proper investigative efforts, competent evidence sufficient to sustain a conviction. The procedures here are no less constitutionally impermissible, and perhaps more unwarranted because so unnecessary."

---

[9] *Blackburn v. Alabama, supra; Haley v. Ohio* (1948), 332 U. S. 596, 68 Sup. Ct. 302, 92 L. Ed. 224.

[10] *Leyra v. Denno* (1954), 347 U. S. 556, 74 Sup. Ct. 716, 98 L. Ed. 948.

[11] *Culombe v. Connecticut, supra; Fikes v. Alabama, supra.*

How then are we to appraise the voluntariness of Mrs. Hoyt's confession in view of the principles outlined above? The following facts stand uncontroverted in the record:

(1) That from 9 p. m. until approximately 12 p. m., May 28, 1962, Mrs. Hoyt was questioned about the circumstances surrounding the shooting although such questioning was not designed to obtain a formal, written confession;

(2) That beginning at about midnight, Mrs. Hoyt was questioned by one officer, Kenneth Hagopian, for the purpose of obtaining a formal confession;

(3) That such questioning continued from shortly after midnight until 3 a. m. on May 29, 1962, and that at that point Mrs. Hoyt indicated that she wanted to make a formal, written confession; that such formal confession was not completely written until 4 :30 a. m. on the 29th;

(4) That from the commencement of the interrogation by Sgt. Hagopian at 12 until the confession was finally written and signed, she was persistently examined about the details of her husband's shooting, and urged to make a full confession;

(5) That during the entire period of interrogation looking toward a confession, Mrs. Hoyt repeatedly said that she was unable to confess because she could not recall the details of the shooting, but that if she were given an opportunity to rest and were examined the next morning she might be able to recall the events more clearly;

(6) That Mrs. Hoyt repeatedly told the officers that she was tired and confused;

(7) That prior to the interrogation beginning at midnight, Mrs. Hoyt had made numerous admissions to police officers in the initial interrogation in the bureau of identification at the Safety Building; moreover, her parents had reported her admissions to them to the police officers who apprehended her at her parents' home;

(8) That Sgt. Hagopian suggested to the defendant that if she co-operated by giving a confession he would try to persuade the district attorney to make the charge manslaughter.

In *Haynes v. Washington, supra,* the supreme court of the United States noted that police officers had testified that they "could not remember" whether or not the petitioner in this case had been told that he could call his wife if, and only if, he co-operated. The court then pointed out that the petitioner had unequivocally testified that he was told that he could contact his wife and family only if he would first confess to the crime with which he was charged. Viewing the testimony of the police and the defendant as a unit, the court said, at page 510:

"No legal alchemy can transmute such wholly equivocal testimony into a denial or refutation of the petitioner's specific recitation of events."

In the instant case, both Mrs. Hoyt and her parents testified that during the period of interrogation beginning around midnight, Sgt. Hagopian told them that if she would co-operate and make a full confession he would see what he could do to persuade the district attorney to charge Mrs. Hoyt with manslaughter. Upon direct examination by the prosecution, Sgt. Hagopian denied having made this statement. Upon cross-examination by the defendant's counsel, he initially reiterated this position. However, upon continued cross-examination, his final testimony was that he could not recall making any statements about any other charge. Upon rebuttal examination, conducted by the prosecution, Sgt. Hagopian testified affirmatively that he did not make any statements about second-degree murder. On this rebuttal testimony, he did not affirmatively state that he made no statements relating to manslaughter. Therefore, comparing his testimony given on rebuttal with his general

statements on cross-examination, that he could not recall having made any statements about any charge, we deem it uncontroverted on the record that Sgt. Hagopian suggested that if Mrs. Hoyt co-operated by giving a confession, he would try to persuade the district attorney to make the charge manslaughter.

Viewing the circumstances as a totality, we cannot conclude that Mrs. Hoyt's confession was a product of self-determination. It is true that the period of interrogation, approximately seven to eight hours, was considerably less than that present in those decided cases where this variable alone was deemed to have rendered the confession inadmissible.[12]

It is also true that there was no evidence that Mrs. Hoyt was insane or possessed only borderline intelligence.[13] Nor was the offer of help outrageously deceitful. Conceivably, Sgt. Hagopian was sincere in his offer of attempting to persuade the district attorney to charge a lesser offense.[14]

Mrs. Hoyt was not denied the opportunity to make face-to-face contact with her family prior to the making of the confession as was the case in *Haynes v. Washington, supra.*

However, the various factors which have been deemed to be evidence of inquisitorial police methods are not to be regarded as all-inclusive. Each case must be evaluated on its own facts, as was clearly pointed out in *Haynes v. Washington, supra,* the most recent United States supreme court case in this area (pp. 514, 515):

[12] *Ashcraft v. Tennessee, supra,* thirty-six hours of intensive interrogation; *Culombe v. Connecticut, supra,* suspect held five days incommunicado.

[13] *Blackburn v. Alabama, supra,* finding that the suspect was insane during the period of interrogation; *Gallegos v. Colorado* (1962), 370 U. S. 49, 82 Sup. Ct. 1209, 8 L. Ed. (2d) 325, suspect was an adolescent boy.

[14] *Leyra v. Denno, supra,* a psychiatrist, utilized for the purpose of obtaining a confession, represented himself in the role of a therapist and physician as a device to obtain such confession.

"We cannot blind ourselves to what experience unmistakably teaches: that even apart from the express threat, the basic techniques present here—the secret and incommunicado detention and interrogation—are devices adapted and used to extort confessions from suspects. . . . Such questioning is undoubtedly an essential tool in effective law enforcement. The line between proper and permissible police conduct and techniques and methods offensive to due process is, at best, a difficult one to draw, particularly in cases such as this where it is necessary to make fine judgments as to the effect of psychologically coercive pressures and inducements on the mind and will of an accused. But we cannot escape the demands of judging . . ."

The record reveals that at the time the final interrogation of Mrs. Hoyt for the purpose of obtaining a confession began, she had already been questioned by several officers about the shooting and had made numerous admissions. By this time her husband's body had been discovered lying in the living room of their home. Certainly by midnight of May 28th the police had ample evidence to support a homicide charge against Mrs. Hoyt. Obviously a written confession by her would increase the probative value of their case. It is reasonable to believe that it was to that end that the interrogation beginning at midnight and ending at 4:30 in the morning was directed. During the questioning from midnight until 3 a. m., Mrs. Hoyt repeatedly expressed her unwillingness to make a written confession. Her uncontroverted testimony is that she herself could not recall the details immediately surrounding the shooting. Yet Sgt. Hagopian persisted. The interrogation during this period may be viewed as having been conditioned by Sgt. Hagopian's effort to seek a manslaughter charge for her if she would co-operate. Certainly this was a powerful inducement upon a woman who, while not insane or feebleminded, was under great psychological stress at the time of the commencement of the interrogation, as evinced by her descrip-

tion of her feelings at the time of the shooting, her parents' description of her condition in their home, and the reports of the police officers who examined her between 9:30 and 12 in the bureau of identification, to the effect that she was unable or unwilling to recount any of the details of the shooting and generally replied to their questions in a disconnected and vague manner.

The record reveals that at 3 a. m. Mrs. Hoyt finally agreed to make the written confession. She did not complete the drafting of this three-page document until approximately 4:30 a. m. All parties testified that she wanted to take her time and that she completed the task in fits and starts. Surely this is graphic evidence of a person completing a personally distasteful task. Therefore, in view of her vulnerable emotional condition at the time the interrogation began, in view of a promise of efforts to obtain a mitigated charge of manslaughter if she would co-operate, and in view of the impact of at least three hours of persistent questioning in relation to the circumstances of a traumatic crime, and in the light of persistent urgings to make a full confession during this three-hour period, and in view of the fact that the physical process of writing the confession gave evidence of an unwillingness to make such a statement, we cannot conclude that Dona Hoyt's confession was an act of self-determination. Many of the ambiguities surrounding her psychological state are resolved in her favor because of the fact that the police had in their possession ample evidence of guilt before they sought the re-enforcing item of a signed confession. Our attitude upon consideration of the totality of circumstances surrounding this confession was well expressed by the United States supreme court in *Haynes v. Washington, supra* (p. 519):

"Official overzealousness of the type which vitiates the petitioner's conviction below has only deleterious effects. Here it has put the State to the substantial additional ex-

pense of prosecuting the case through the appellate courts and, now, will require even a greater expenditure in the event of retrial, as is likely. But it is the deprivation of the protected rights themselves which is fundamental and the most regrettable, not only because of the effect on the individual defendant, but because of the effect on our system of law and justice. Whether there is involved the brutal 'third degree,' or the more subtle, but no less offensive, methods here obtaining, official misconduct cannot but breed disrespect for law, as well as for those charged with its enforcement."

Because the confession was not "constitutionally antiseptic" we conclude that there was error in receiving it into evidence and a new trial must be granted to the defendant.

### The Requested Manslaughter Verdict.

Upon the completion of the trial, counsel for the appellant made a motion to submit a number of alternative verdicts other than guilty of murder in the second degree, the offense charged in the conviction, and not guilty. He proposed that the verdict include a question permitting the jury to find the defendant guilty of manslaughter under sec. 940.05 (1), Stats.[15] He also asked for other alternative verdicts: Homicide by reckless conduct, sec. 940.06, and homicide by negligent use of a weapon, sec. 940.08.

The trial court denied these requests and submitted only two possible verdicts to the jury: Guilty of murder in the second degree, the offense upon which the defendant was tried, and not guilty.

The general standard for determining whether or not alternative verdicts ought to be submitted to the jury in a

---

[15] "940.05 MANSLAUGHTER. Whoever causes the death of another human being under any of the following circumstances may be imprisoned not more than 10 years: (1) Without intent to kill and while in the heat of passion; . . ."

homicide prosecution has been announced on several occasions.

"The test to be applied in determining whether lesser degrees of the offense charged are to be submitted on request is whether there is some reasonable ground in the evidence, in the judgment of the court, for a conviction of the lesser offense. *State v. Stortecky, supra.*

"Putting it in another way, if the evidence, in one reasonable view, would suffice to prove guilt of the higher degree beyond a reasonable doubt, and if, under a different, but reasonable view, the evidence would suffice to prove guilt of the lower degree beyond a reasonable doubt, but leave a reasonable doubt as to some element included in the higher degree but not in the lower, the court should, if requested, submit the lower degree as well as the higher." [16]

To determine whether or not there is a reasonable basis in the evidence to have justified submitting an instruction relating to manslaughter, we must inquire into what is the required state of mind of the defendant for conviction under murder in the first degree, sec. 940.01, Stats.,[17] murder in the second degree, sec. 940.02,[18] and manslaughter, sec. 940.05 (1).

As we have stated, throughout the entire trial there never was any dispute about the fact that Mrs. Hoyt had shot her husband. Neither was there any doubt that the shooting was the cause in fact of her husband's death. The only matter

---

[16] *Zenou v. State* (1958), 4 Wis. (2d) 655, 668, 91 N. W. (2d) 208. See also *State v. Stortecky* (1956), 273 Wis. 362, 77 N. W. (2d) 721; *Brook v. State,* ante, p. 32, 000 N. W. (2d) 000.

[17] "940.01 FIRST-DEGREE MURDER. (1) Whoever causes the death of another human being with intent to kill that person or another shall be sentenced to life imprisonment.

"(2) In this chapter 'intent to kill' means the mental purpose to take the life of another human being."

[18] "940.02 SECOND-DEGREE MURDER. Whoever causes the death of another human being by conduct imminently dangerous to another and evincing a depraved mind, regardless of human life, may be imprisoned not less than 5 nor more than 25 years."

at issue was her psychological state at the time she so acted. For first-degree murder, the prosecution must prove that the homicide was intentional. That is to say that the defendant's course of conduct was undertaken for the purpose of bringing about the victim's death.[19]

By definition, second-degree murder is an unintentional killing. The overt behavior which produces death must be characterized as conduct evincing a depraved mind. A "depraved mind" has been defined in these terms:

"The phrase 'a depraved mind' as used in defining murder in the second degree carries the suggestion of an induced or self-created condition of mind, and is to be distinguished from a state of mind generally described as insanity or feeblemindedness resulting from some disease or defect existing from birth or early childhood."

The statutory definition of manslaughter which is relevant[20] here is: "Whoever causes the death of another human being . . . without intent to kill and while in the heat of passion; . . ." On its face, the statute treats manslaughter as an unintentional killing.

Thus, both manslaughter and second-degree murder assume that the killing was not purposive. The essential difference between the two degrees of homicide does not lie in the nature of the course of conduct, but rather in the state of mind with which the conduct is carried out. Criminal homicide constitutes manslaughter when a homicide which would otherwise be second-degree murder is committed under the influence of extreme emotional disturbance for which

[19] *Hogan v. State* (1874), 36 Wis. 226. See Comment, 1953 Report of the Wisconsin Legislative Council, Judiciary Committee Report on the Criminal Code, p. 58. Sec. 939.23 (4), Stats., " 'With intent to' or 'with intent that' means that the actor either has a purpose to do the thing or cause the result specified or believes that his act, if successful, will cause that result."

[20] *State v. Johnson* (1940), 233 Wis. 668, 672, 290 N. W. 159.

there is a reasonable explanation or excuse. The reasonableness of such explanation or excuse shall be determined from the viewpoint of a person in the actor's situation under the circumstances as he believes them to be.[21]

In analyzing this formulation, we must ask ourselves, Why does the legislature make a grading between homicides? Why not simply hold that one who kills another should be subjected to an invariant punishment? Legislative gradings of homicides recognize that society places different estimates on the moral reprehensibility of the defendant's conduct in each type of homicide, and that variations in the defendant's character justify variations in the sentence. Distinctions between degrees of homicide on the basis of the state of mind of the defendant permit the trier of fact to make moral evaluations of the defendant's character and within general limits determine the proper punishment. For example, in Wisconsin, the primary practical distinction between first-degree murder and second-degree murder and manslaughter lies in the maximum sentence permitted for conviction of each and in variations in parole eligibility for a person convicted under one of these categories. A person convicted of murder in the first degree must be sentenced to life imprisonment and is eligible for parole only after eleven and one-half years of incarceration. A person convicted of murder in the second degree may serve a maximum term of twenty-five years and is eligible for parole only after two years of confinement. On the other hand, a person convicted of manslaughter may be eligible for parole at the end of one year of incarceration, and may not serve a maximum term longer than ten years. The only rational basis of placing a defendant in one category or another is to make some moral evalu-

---

[21] This is the recommended formulation of manslaughter test suggested by the American Law Institute, Model Penal Code, sec. 210.3 (official draft 1962), p. 126.

ation of his act of homicide. This can be done effectively only if we consider the total context in which the crime occurred.

The state of mind of the defendant at the time of the shooting is crucial because it bears upon an inference as to his total character and this in turn points to the different degrees of homicide of which he may have been guilty. In the end the question will be whether the defendant's loss of control can be understood in terms to arouse sympathy enough to call for mitigation in the sentence.

This court has previously recognized that conduct normally denominated as second-degree murder may be treated as manslaughter if there was some justification or excuse for the conduct under all the circumstances.

In *Radej v. State* [22] the court said:

"Surely, for a person to point a loaded revolver at a vital part of another's body and discharge it, is to perpetrate an act imminently dangerous to others, and if done without excuse or justification and not in the heat of passion characterizing some lower degree of homicidal offense than murder in the second degree, evinces 'a depraved mind, regardless of human life.' "

A reasonable man could conclude that from her situation at the time of the shooting, Mrs. Hoyt's loss of control was reasonably justified. Her own reports of her feelings and perceptions are those of a person suffering great emotional turmoil, or so a reasonable juror could infer. Her parents' testimony as to her vacant and distraught manner while speaking to them, is further evidence from which a jury could reasonably infer the presence of extreme emotional distress. Given the history of physical and emotional abuse to which Mrs. Hoyt and her child were subjected by the deceased, a reasonable jury could find that the shooting was an act of desperate self-affirmation.

---

[22] (1913), 152 Wis. 503, 509, 140 N. W. 21.

The state contends that it was not error to refuse to submit an instruction of manslaughter because during the course of interrogation Mrs. Hoyt acknowledged that she had wanted to kill her husband. The state also contends that the fact that Mrs. Hoyt was able to recall with such vividness the details surrounding the shooting is evidence that no manslaughter verdicts should have been submitted. The evidence to which the state points is of an intention to kill. Had the defendant been charged with first-degree murder the state's argument may have had considerable force. Yet by charging Mrs. Hoyt with second-degree murder, the state itself took the position that the killing was unintentional in the sense that she did not undertake her course of conduct solely for the purpose of bringing about her husband's death. The state cannot be permitted to charge second-degree murder and then resist submission of manslaughter verdicts on the grounds that there was evidence to indicate that the killing was intentional and that before a manslaughter verdict is justified, the evidence must indicate that the defendant's emotional distress was so great as to totally vitiate an intention to kill. By charging murder in the second degree, the state was under no obligation to offer proof of intent to kill. To permit the state to use evidence of intention only defensively to avoid submission of lower verdicts would mean that in every instance in which the state charged second-degree murder in which there was some evidence of a specific intent, submission of a manslaughter verdict would never be justified. It is unreasonable to confront the jury with an either/or choice between second-degree murder or not guilty. Conduct which may be regarded as the basis of second-degree murder appears less morally reprehensible when the defendant's emotional condition and the reasons for such condition are evaluated by the trier of fact. The submission of a verdict of manslaughter permits the jury to make precisely this evaluation.

In considering whether the defendant had committed second-degree murder or manslaughter, the differences between what she stated in her confession and her description of how she ended up with the gun in hand before the shooting, as contained in her testimony, are of some importance. In her confession she wrote:

". . . I saw the gun on the shelf, reached for it, put it behind my back and walked into the living room thinking I'd scare him into stopping insulting me."

On the witness stand she testified:

"And I saw the door open, it has a mirror on it, and I took my hand and I was going to close the door, and I looked up and my eyes saw this gun. I don't feel like I even reached for it, it just seemed like I was drew to touch that gun and—I mean, in a fog, I wasn't thinking, I wasn't planning, I wasn't doing anything.

"I just reached this gun and I had it in my hands and some leather covering of some sort fell down and I was looking at this gun in my hands, and I was just foggy and I was staring at this gun. And I walked out two steps, I think it was, and I'm out of this room and I was in the hall, and as soon as I realized I was in the hall and I had that gun I quick put it in back of me. And I heard a little noise outside and I walked, turned—the hall is so small—I turned to the living room and Bill could see me and I was standing with my hands behind my back."

The difference points to the emotional state of the defendant at the time of the shooting and is further reason why an alternative manslaughter verdict should have been included here.

Therefore, we conclude that the jury should have been permitted to evaluate Mrs. Hoyt's conduct under the standard suggested above and given the chance to conclude that the shooting was an act under emotional distress for which

there was a reasonable explanation. The trial court's failure to submit the requested manslaughter verdict was error and constitutes an additional reason for reversing the judgment of conviction and ordering a new trial.

We conclude that there was no evidence on the record to justify submission of alternative verdicts of homicide by reckless conduct or homicide by negligent use of a firearm.

## *The Search.*

Appellant also contends that certain information admitted into evidence was admitted in violation of the due-process clause of the Fourteenth amendment, U. S. constitution, because such information was obtained as a result of an illegal search.

The facts concerning the search are not disputed.

The officers who arrived at the Hoyt home with the ambulance found no one at home. They rapped on the door but received no response. Finally, one officer looked through a window at the side of the home and saw a body lying on the floor. The police then entered through the back door of the house which was not locked, and went into the living room, where they had seen the body. Immediately adjacent to the body was a gun. Upon observing this scene these officers called their superiors. While waiting for their superiors, they made exploration of the entire Hoyt home. Most significantly, they went into the child's bedroom, where they discovered the holster from which the weapon used in the homicide had been taken by Mrs. Hoyt.

In response to the call of these officers, other policemen arrived on the scene and took the gun into their custody. They also took pictures of the position of the body and of the room in which the shooting had occurred.

Appellant's counsel did not raise his objections to the admissibility of this evidence until the trial on the merits. The trial court ruled:

"Objection overruled—untimely, for one thing—overruled. Also, reasonable apprehension that there was a situation justifying entry—overruled."

In so doing he relied on sec. 955.09 (3), Stats.:

"(3) Defenses and objections based on defects in the institution of the proceedings, insufficiency of the information or indictment, invalidity in whole or in part of the statute on which the prosecution is founded, or the use of illegal means to secure evidence (except confessions) must be raised before trial by motion or be deemed waived. But the court may, in its discretion, entertain such motion at a later stage of the trial, in which case the defendant waives any jeopardy that may have attached. . . ."

It is apparent that the trial court exercised his discretion in receiving the objection and ruling on the merits.

We do not believe that this is a proper case to rule on whether a defendant may fail to make a timely objection as provided in sec. 955.09 (3), Stats., but nevertheless make his objection at the trial asserting that his constitutional rights would be violated by the introduction of the evidence and that he could raise an objection to the evidence even at the later date. Because the trial court considered the merits we may review his determination.

We cannot agree with the appellant's claim that all of the evidence should have been excluded from the trial because it was not obtained pursuant to a search warrant nor as a result of a search incidental to a lawful arrest.

In *Mapp v. Ohio* [23] the United States supreme court held that if evidence were seized in violation of the Fourteenth

---

[23] (1961), 367 U. S. 643, 81 Sup. Ct. 1684, 6 L. Ed. (2d) 1081.

amendment, then to admit it at the trial in a state case would be a violation of due process of law.

It was not until *Ker v. California* [24] that a standard was laid down as to the circumstances under which evidence would be deemed to have been obtained by an illegal search and seizure. In *Ker,* the United States supreme court ruled that henceforth, whether or not a particular search and seizure is reasonable under the Fourteenth amendment would be determined by federal constitutional standards. Therefore, under *Ker,* we must look to federal constitutional law relating to unreasonable searches and seizures to determine whether the evidence was illegally obtained in this case. The United States supreme court has recognized that evidence may be lawfully obtained under certain circumstances without a search warrant and even though no valid arrest has been made at the time of obtaining such evidence. [25] This is the exceptional-circumstances doctrine which was again recognized in *Ker v. California, supra.*

On the facts in the instant case the police officers were justified in entering Mrs. Hoyt's home. They had received a report that there had been an accidental shooting at her address. At the time of their arrival, they did not know whether or not there might be an injured person in the home who needed immediate medical attention. Upon observing a body lying on the floor it was their duty to enter the home in light of the report that they had previously received. Upon entering the home, the weapon was immediately adjacent to the body and hence was in full view of anyone who stood

[24] (1963), 374 U. S. 23, 83 Sup. Ct. 1623, 10 L. Ed. (2d) 726.
[25] *Johnson v. United States* (1948), 333 U. S. 10, 68 Sup. Ct. 367, 92 L. Ed. 436; evidence may be seized if threatened with removal or immediate destruction in the absence of a warrant or a valid arrest. *Carroll v. United States* (1925), 267 U. S. 132, 45 Sup. Ct. 280, 69 L. Ed. 543; contraband may be seized in the absence of a search warrant or valid arrest.

in the living room. Therefore, it cannot be maintained that this weapon was brought into the custody of the police as a result of a search. The United States supreme court has held that evidence in the full view of a police officer appearing upon the scene, and subsequently taken into custody by him, is not brought into his control by means of a search.[26]

We conclude that because the officers were justified in their original entry into the Hoyt living room and because the bringing of the gun into their custody was not the consequence of a search, the Fourth amendment, binding upon the states through the due-process clause of the Fourteenth amendment, was not violated. Therefore, the weapon, the description of the body, and the description of the physical layout of the living room were obtained as a result of a justified entry into the Hoyt home and were properly admitted.

We also hold, however, that the exploratory search by the officers of every room of the defendant's home was a violation of the provision against unreasonable searches and seizures. Even assuming that the officers had made a valid arrest of Mrs. Hoyt in her living room at the time they entered the home, they would not have had legal authority to conduct a general exploratory search throughout the entire home, pursuant to that valid arrest.[27] A fortiori, the officers were not justified in making a general search of the house without a search warrant, and in the absence of a valid arrest. Therefore, the holster obtained in the boy's room as a result of the illegal search was not validly admitted into evidence.

We cannot agree with the state that Mrs. Hoyt consented to having her home searched by virtue of having admitted

[26] United States v. Rabinowitz (1950), 339 U. S. 56, 70 Sup. Ct. 430, 94 L. Ed. 653.

[27] United States v. Rabinowitz, supra; Kremen v. United States (1957), 353 U. S. 346, 77 Sup. Ct. 828, 1 L. Ed. (2d) 876.

her crime to her parents who, in turn, informed the police. Under federal standards which now control the reasonableness of a search and seizure, consent to a search must be expressed in clear and unequivocal terms. In *Channel v. United States* [28] a suspect while in jail made a statement to the effect, "I have no stuff in my apartment and you are welcome to go search the whole place." The court held that this statement, under these circumstances, made while he was incarcerated, did not constitute unequivocal consent. The court concluded that rather than the calm statement of an innocent man, the suspect could have been expressing the "false bravado of a small time criminal." It appears from this case that consent to a search without a warrant must be given in specific terms while the suspect is on the premises of his property. These conditions were present in *Holt v. State.* [29]

*By the Court.*—Judgment reversed, and cause remanded for a new trial in accordance with this opinion.

GORDON, J. (*concurring*). While I concur in the court's opinion, I add these remarks to suggest that it is not only the confession which should be rejected upon the new trial but also all the blemished by-products which may reasonably have flowed from such illegal confession.

The confession itself is tainted and so must be the fruits thereof. It may sometimes be difficult to determine whether certain evidence actually stemmed from the confession. Specifically, should the trial court permit the prosecution to place into evidence the testimony which Mrs. Hoyt gave on the witness stand at the first trial? Such testimony has only a few variations from her confession and may or may not have been induced by the erroneous receipt of the confession.

---

[28] (9th Cir. 1960), 285 Fed. (2d) 217.
[29] (1962), 17 Wis. (2d) 468, 117 N. W. (2d) 626.

However, I believe that it would be the responsibility of the trial court to determine whether Mrs. Hoyt took the witness stand for the primary purpose of opposing her written confession. If so, it would seem to me that this is a fruit of the contaminated confession and bears its infection.

If, on the other hand, the trial court concludes that she took the stand for reasons other than to counter or vary the confession, it would not be required to exclude her testimony given at the first trial.

This "tainted fruit" concept would obviously not require any rejection of Mrs. Hoyt's admissions made to the officers early in the evening. It would not justify a dismissal of the charges against her. In this respect, we would not need to go so far as did the Washington court which recently discharged a prisoner whose conversations with his attorney were taped with a hidden microphone. *State v. Cory* (Wash. 1963), 382 Pac. (2d) 1019, 1022. There the court said:

"There is no way to isolate the prejudice resulting from an eavesdropping activity, such as this. If the prosecution gained information which aided it in the preparation of its case, that information would be as available in the second trial as in the first. If the defendant's right to private consultation has been interfered with once, that interference is as applicable to a second trial as to the first. And if the investigating officers and the prosecution know that the most severe consequence which can follow from their violation of one of the most valuable rights of a defendant, is that they will have to try the case twice, it can hardly be supposed that they will be seriously deterred from indulging in this very simple and convenient method of obtaining evidence and knowledge of the defendant's trial strategy."

I am authorized to state that Mr. Justice HALLOWS joins in this concurrence.