HOLT, Plaintiff in error, v. STATE, Defendant in error.*

*September 7—October 30, 1962.*

---

\* Motion for rehearing denied, without costs, on January 10, 1963.

470

472

For the plaintiff in error there were briefs and oral argument by *Sherwood Slate* of Milwaukee.

For the defendant in error the cause was argued by *William A. Platz* and *John H. Bowers,* assistant attorneys general, with whom on the brief were *John W. Reynolds,* attorney general, and *William J. McCauley,* district attorney of Milwaukee county, and oral argument also by *Aladin A. DeBrozzo,* assistant district attorney.

GORDON, J.   The defendant's contentions can be grouped into five separate categories:

## 1.   *Unlawful Search and Seizure.*

The defendant urges that her constitutional rights were infringed upon when the officers gained admittance to the home at the invitation of her husband and also when they searched the premises without a search warrant.

The husband's act of admitting the officers was consistent with his status. He had at least equal prerogatives on the premises and had authority to admit others to his home. We do not have to go as far as the court did in *United States v. Sferas* (7th Cir. 1954), 210 Fed. (2d) 69, 74, when it said:

". . . the rule seems to be well established that where two persons have equal rights to the use or occupation of premises, either may give consent to a search, and the evidence thus disclosed can be used against either."

In the instant case, no search was conducted by the officers upon the sole strength of the husband's having admitted

them; the officers did nothing until they met with and spoke to the defendant.

The defendant relies upon *People v. Dent* (1939), 371 Ill. 33, 19 N. E. (2d) 1020, but we deem that case distinguishable on its facts. In that case the search and seizure was by the officers upon their entrance to the premises; not having a search warrant, the officers rang the doorbell and entered when a voice called out, "Come in." It was not the defendant's voice, but rather was that of a companion. The Illinois court did not consider this an invitation by the defendant or by anyone else who was authorized to admit the officers. The search and seizure, which was made immediately after the improper entry, was conducted without any authorization from the defendant.

A close question is presented to this court: Was the trial court's finding that Mrs. Holt consented to the search reasonable under all the circumstances of this case?

At the outset it should be noted that the prohibition of the Fourth amendment is now applicable to evidence submitted in state courts. This was not true at the time of Judge STEFFES' decision. He properly relied upon *Wolf v. Colorado* (1949), 338 U. S. 25, 69 Sup. Ct. 1359, 93 L. Ed. 1782; however, the latter case has since been upset by *Mapp v. Ohio,* 367 U. S. 643, 81 Sup. Ct. 1684, 6 L. Ed. (2d) 1081, decided on June 19, 1961. In reversing *Wolf v. Colorado,* the *Mapp Case* held that evidence obtained by searches and seizures in violation of the federal constitution is inadmissible in a criminal trial in a state court.

Accordingly, those cases in the federal court which have examined the question of consent to a search and seizure are germane to our decision. In *Channel v. United States* (9th Cir. 1960), 285 Fed. (2d) 217, 219, the court said:

"A search and seizure may be made without a search warrant if the individual freely and intelligently gives his

unequivocal and specific consent to the search, uncontaminated by any duress or coercion, actual or implied. The government has the burden of proving by clear and positive evidence that such consent was given."

A similar standard is expressed in *Judd v. United States* (D. C. Cir. 1951), 190 Fed. (2d) 649, 651, wherein it is said that "consent must be proved by clear and positive testimony."

Another expression demonstrating the reluctance to find consent where there has been a search and seizure without a warrant is *United States v. Arrington* (7th Cir. 1954), 215 Fed. (2d) 630, 637, where the court said:

"It is high time that courts place their stamp of disapproval upon this increasing practice of federal officers searching a home without a warrant on the theory of consent, particularly where no reason is shown why a search warrant was not obtained. The protection afforded by the Fourth amendment should not be made dependent upon the probity of an officer attempting to justify a search on consent. Otherwise, the rights guaranteed to the citizen by the amendment will be impaired so as to become little more than an empty gesture."

There can be little doubt that upon an adequate showing of consent to the search of one's premises a defendant may not claim an invasion of his constitutional rights. *Milyonico v. United States* (7th Cir. 1931), 53 Fed. (2d) 937; *United States v. Ziemer* (7th Cir. 1961), 291 Fed. (2d) 100; *State v. Zuehlke* (1941), 239 Wis. 111, 116, 300 N. W. 746. Cf. *Agnello v. United States* (1925), 269 U. S. 20, 32, 46 Sup. Ct. 4, 70 L. Ed. 145.

The defendant maintains that the circumstances of the instant search and seizure demonstrate the existence of an unfair pressure upon Mrs. Holt by reason of the fact that she was confronted by police officers who showed their badge of authority; it is urged that compliance with such authority should be held to be compulsive and not con-

sensual. The defendant points out that in *State v. Warfield* (1924), 184 Wis. 56, 61, 198 N. W. 854, this court quoted the following:

" 'It must be first premised that where an officer, politely and decently and without physical threat, has assumed to act in his official capacity, he is acting *de facto,* if not *de jure,* and a peaceful citizen should not forcibly resent the action, even though he knows the officer is, as to the act, greatly exceeding his authority, resting confidently upon the belief that this submission will not impair any of his constitutional rights; for, as the courts have repeatedly held, such action will not be taken to be a consent to an unlawful search or arrest, but merely a peaceful submission to officers of the law.' "

Another case which tends to support the defendant's position is *United States v. Slusser* (S. Dist. Ohio, 1921), 270 Fed. 818, where the court said, at page 819:

"The search so permitted by Slusser, after declaration by the prohibition officer, with a display of his badge, that they were there to search the premises, was not by such consent as will amount to a waiver of constitutional rights, but, on the contrary, is to be attributed to a peaceful submission to officers of the law."

This court is deeply concerned about the technique employed in the instant case by which the incriminating evidence was obtained. The practice employed by the police in the present case constitutes an invitation to breaches of peace and threatens the citizen's right to be secure in his home. It has the additional flaw, as suggested in the *Arrington Case, supra,* of encouraging police officers to circumvent the search-warrant technique and to buttress their searches with a claim of consent for purposes of convenience or the overzealous desire to obtain a conviction. Trial judges are enjoined to scrutinize claims of consensual searches and seizures made in a dwelling place to satisfy

themselves that the consent was, in the words of the *Channel Case,* "uncontaminated by any duress or coercion, actual or implied."

The proper way to search a dwelling place is to obtain a search warrant. A home is entitled to special dignity and special sanctity. It is noted that *United States v. Rabinowitz* (1950), 339 U. S. 56, 64, 70 Sup. Ct. 430, 94 L. Ed. 653, approved a search and seizure which was incident to a lawful arrest. However, the court expressly noted that "the place of the search was a business room to which the public, including the officers, was invited."

Was the consent on the part of Mrs. Holt freely and intelligently given? Was it contaminated by duress or coercion? Was the search the result of Mrs. Holt's nonconsensual submission? Fully mindful of the foregoing authorities, the majority of this court is nevertheless in accord with the trial judge's conclusion that Mrs. Holt's consent in the instant case was voluntary and was freely given. We base this conclusion upon the entire record. For example, on two different occasions Mrs. Holt described the officers' conduct as follows: "They didn't use any force on me in any way, and they were pretty courteous throughout the questioning." "I never told them to get out of the house. They were always polite and they treated me courteously while they were there."

The record contains additional examples of statements made by Mrs. Holt which tend to support the trial court's conclusion that she freely gave her consent to the search. When the officers asked to talk to her privately, Mrs. Holt answered "Yes," and she invited the officers into another room, out of the presence of her husband. After the defendant admitted that she had delivered a baby and placed it into the furnace, Officer Robert Gaurke asked her if she would take them to the basement, and the defendant an-

swered "Yes," and then led the way to the basement. In the basement the defendant, without being asked, pointed to the furnace and said that the baby was in there. Gaurke asked her permission to go into the furnace and she said, "If you want to, go ahead."

While we admonish against the technique employed, we are satisfied that the trial court could reasonably conclude that no abuse occurred in this particular case. To avoid the "brinkmanship" inherent in the present case, the police would do well to investigate and interrogate till they have enough evidence to support the issuance of a search warrant. It is appropriate for police officers, without having a search warrant, to call upon a suspect at his home for the purposes of talking with him; however, if there is to be an actual search of a home it is better that it be made with a search warrant, rather than to rely on consent.

### 2. *Admissions and Confession.*

Mrs. Holt contends that her admissions and confession were illegally obtained and should not have been received in evidence against her. It is unquestionably true that without her own declarations Mrs. Holt could not have been found guilty of murder. Her challenges to their receipt follow two principal lines of argument: (1) The statements were not voluntary by reason of her having been detained by the police without food for six hours on the day of her arrest, during which time she was constantly interrogated, and (2) the officers failed to apprise her of her constitutional right not to incriminate herself.

We have carefully examined the record, and we are satisfied that Mrs. Holt's declarations were voluntarily made. The jury was properly instructed to disregard her statements if it believed they were not voluntary. It is noted that her statement given to the district attorney, taken in the presence of her counsel, confirms a large number of

the admissions which were relied upon by the state at the trial.

There is no hard-and-fast rule in this state that an accused must be informed of his constitutional right not to incriminate himself. This court in *State v. Bronston* (1959), 7 Wis. (2d) 627, 641, 97 N. W. (2d) 504, said:

"The defendant was not advised by the police officials at the time of his interrogation of his right under sec. 8, art. I, Wis. Const., to refuse to answer questions that might incriminate him. Confessions are not necessarily inadmissible for failure to advise of the constitutional right against self-incriminaton. *Link v. State* (1935), 217 Wis. 582, 586, 259 N. W. 428, 261 N. W. 416; and *State v. Whatley* (1933), 210 Wis. 157, 168, 245 N. W. 93. In the instant case we are convinced that the defendant, because of his intelligence and education, and the newspaper and magazine publicity that has been given in the past few years to the right of citizens against self-incrimination, was well aware of such right at the time of his interrogation."

Mrs. Holt testified that she had completed two years of high school, that she read the newspapers and was pretty well conversant with the events of the time. She is not an illiterate or unintelligent person in whose behalf the court might impose a stricter standard upon law-enforcement officers relative to the privilege against self-incrimination. In addition, there was credible testimony that she was aware of her rights under the Fifth amendment. While en route to the police headquarters she was heard to state that she did not intend to answer any further questions based upon the Fifth amendment. This pronouncement reflects an awareness of her rights which obviates any doubts that might otherwise exist that she needed a caution about her constitutional right not to incriminate herself.

In the *Bronston Case, supra,* Mr. Justice CURRIE, writing for the court, stated at page 641: "We commend the practice of law-enforcement officers informing arrested persons

accused of crime of such constitutional right before questioning them." We reiterate that suggestion but opine that failure to do so will not render the product of the interrogation inadmissible unless it appears that the defendant by reason of his education, intelligence, or other circumstances has been imposed upon.

### 3. Sufficiency of Evidence.

The defendant contends that there was insufficient evidence to convict her in that the *corpus delicti* was not proved by evidence independent of her confession and that there was insufficient proof that the infant was alive at the time it was placed in the furnace. There is no merit to these contentions.

With reference to the *corpus delicti,* we recognize that a number of states have adopted the rule urged by the defendant. The rule in Wisconsin, however, has been set down in *Potman v. State* (1951), 259 Wis. 234, 243, 47 N. W. (2d) 884, where this court stated:

"It is contended on behalf of defendant that the judgment convicting her of the crimes charged in the information cannot be sustained because,—as her attorneys contend, —the state failed to establish the *corpus delicti* independent of her extrajudicial confessions or admissions. That would be true under the law in that respect in some American jurisdictions, but that is not the rule in this state."

All the elements of the crime do not have to be proved independently of an accused's confession; however, there must be some corroboration of the confession in order to support a conviction. Such corroboration is required in order to produce a confidence in the truth of the confession. The corroboration, however, can be far less than is necessary to establish the crime independently of the confession. If there is corroboration of any significant fact, that is sufficient under the Wisconsin test.

In the case at bar the finding of a charred human torso with an eight-to-nine-month gestational period in the furnace of the defendant's residence constituted sufficient independent corroboration.

Whether the child was alive at the time it was placed in the furnace was an issue of fact for the jury. The judge's instructions made the jury's responsibility on this issue crystal clear:

"Obviously, if you have any reasonable doubt as to whether such child was born alive or if you have any reasonable doubt that such child was alive at the time of the act of killing charged against the defendant, or that at such time the defendant knew such child was alive, then you must resolve such doubt in favor of the defendant and find the defendant not guilty."

The testimony which supports the jury's finding and shows that the child was alive came from numerous witnesses. Officer Richard Adams testified:

"I asked her if the baby was crying when it was born and she said 'Yes.' And then she also told me that it cried when she threw it into the furnace."

Officer Robert Gaurke testified that he further questioned Mrs. Holt while he was removing the ashes from the furnace. He said:

"While I am doing that I asked Mrs. Frances Holt if she knew if this baby was born alive, and she said 'Yes.' And I said, 'How do you know it was born alive?' And she said, 'It cried when it was born.' And then I asked, 'Well, did it cry when you put it in the furnace?' And she said 'Yes.' And I asked her once more, I said, 'Did—do you mean to say that it cried when you put it in the furnace?' And she said 'Yes.'"

Officer Albert Marino testified that he overheard that conversation with Mrs. Holt:

"*Q.* Do you recall any parts of the conversation? *A.* Yes, he had asked her if the baby cried when the baby was born

and she says 'Yes,' and he also asked her did she hear the baby cry as she was putting the baby into the furnace and she said 'Yes.'

"*Q.* You heard that? *A.* Yes."

Officer Joan Hobus also confirmed the conversation described by Robert Gaurke. Officer Hobus testified:

"*A.* He had asked Mrs. Holt how she knew the baby was alive and she said it had cried, and he said 'It cried?' And she said 'Yes, it cried when it was in the bedspread and it cried on the hamper and,' she said, 'it cried in the furnace.' And he said 'You mean the baby cried in the furnace?' And she said 'The baby cried while I was lighting the fire.'

"*Q.* Did he make any comment to you at this time? *A.* Yes.

"*Q.* What was the comment? *A.* He told me to put that statement in my notebook.

"*Q.* Did you have a notebook with you? *A.* Yes, I did.

"*Q.* And did you put the statement in the notebook? *A.* Yes, I did.

"*Q.* Do you remember what the words were? *A.* Yes.

"*Q.* What were the words? *A.* 'Baby cried while I was lighting the fire.' "

Mrs. Holt testified at the trial that the child was not born alive, but there were other declarations by Mrs. Holt which tended to support the statements of the aforementioned witnesses. Mrs. Holt described her taking the baby into the bathroom after its birth. She was asked:

"*Q.* Was the baby crying? *A.* It was just laying there. And again I was so excited all I could think was to try to keep it from him, try and get it *where my husband wouldn't hear it.*" (Emphasis added.)

Mrs. Holt also testified that she felt life while she was pregnant with the child. This tends to corroborate the existence of life, although by itself it would not prove the child was alive when born or when placed in the furnace.

### 4.  Receipt of Degrading Testimony.

The defendant has set forth 20 instances of allegedly improper and degrading evidence. We are convinced that there was no prejudicial error committed in connection with the instances asserted by the defendant. In view of the sordid nature of the offense charged, it was inevitable that the record could scarcely read like something from *Little Women*. It was entirely proper that the state should offer evidence of the unsavory minutiae surrounding the charged crime. The details of Mrs. Holt's comprehension of sexual intercourse, menstruation, and the physical aspects of childbirth were unavoidably necessary in this trial.

In view of the defendant's claim that she disposed of the body because she did not want her husband to know of its birth, it was proper to explore the illegitimacy of the child. The evidence relating to her family life, schooling, and previous marriages all touched upon matters germane to the issues before the court and jury. We can see no relevance to her having been interrogated as to her receipt of aid for dependent children, but we are satisfied that this error was not prejudicial to her.

### 5.  Charge to the Jury.

The defendant claims that the language employed in the court's instructions to the jury invaded the jury's province by unintentionally suggesting that the court considered that the child was in fact alive when placed in the furnace. We have examined the instructions and conclude that the claim is completely devoid of merit.

*By the Court.*—Judgment affirmed.

FAIRCHILD, J.  (*concurring*).  I would not direct any criticism at the police officers for failure to obtain a warrant before going to talk with Mrs. Holt. The information

which aroused them was a report by a neighbor of a statement Mrs. Holt had made. The report could not be overlooked, but it seemed good judgment to obtain Mrs. Holt's side of the story before initiating any other action on the basis of the report alone.

Proof that the officers said to Mrs. Holt that she had the right to refuse permission to search would have made a clearer case of consent, and I join in the suggestion that it would be an excellent practice for officers to give such information. But under the circumstances described here, I would see no reason, once the officers were satisfied that Mrs. Holt consented to the search, to leave her home in order to obtain a search warrant.

DIETERICH, J. (*dissenting*). I disagree with the majority that the facts in this case support the conclusion that defendant freely consented to a search of her home.

The majority opinion deplores the police methods used in the instant murder case. This does not erase the fact that the opinion holds those practices constitutional.

When the defendant first saw the police officers they had entered her living room. That they entered with the husband's permission is immaterial, the fact is that defendant was confronted by a hostile situation immediately upon entering her own living room. Under these conditions I do not think it can be said that defendant's consent to a search was free, intelligent, specific, unequivocal, and "uncontaminated by any duress or coercion, actual or implied." *Channel v. United States* (9th Cir. 1960), 285 Fed. (2d) 217, 219.

The acts of the defendant are as consistent with the proposition that defendant submitted to lawful authority in permitting the search and seizure as they are to the proposition that defendant freely consented to such search and seizure.

The Fourth amendment to the United States constitution and sec. 11, art. I of the Wisconsin constitution [1] protect the rights of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. This is a basic right of all the people without exception. I agree with the dissenting opinion of Mr. Justice DOUGLAS in *Abel v. United States* [2] where he made this comment on the eroding of the guaranties contained in the Fourth amendment: "Cases of notorious criminals—like cases of small, miserable ones—are apt to make bad law. When guilt permeates a record, even judges sometimes relax and let the police take shortcuts not sanctioned by constitutional procedures. . . . The harm in the given case may seem excusable. But the practices generated by the precedent have far-reaching consequences that are harmful and injurious beyond measurement."

An individual's constitutional guaranties should be construed in favor of the individual and not the government. Therefore, under the facts of this case, the prosecution fails for lack of evidence to prove, beyond a reasonable doubt, that defendant freely consented to the search of her home.

[1] Fourth amendment to the United States constitution. "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Note: The provision of the Wisconsin constitution relating to searches and seizure, sec. 11, art. I, uses the same language as above, but with slightly different punctuation.

[2] *Abel v. United States* (1960), 362 U. S. 217, 241, 80 Sup. Ct. 683, 4 L. Ed. (2d) 668. A five-to-four decision with a dissent by Mr. Justice DOUGLAS with whom Mr. Justice BLACK concurred, and a dissent by Mr. Justice BRENNAN with which Messrs. Chief Justice WARREN, Justices BLACK and DOUGLAS joined.