SCHULTZ, Plaintiff in error, v. STATE, Defendant in error.

*No. 76–208–CR. Submitted on briefs March 8, 1978.—*
*Decided April 5, 1978.*
(Also reported in 264 N.W.2d 245.)

738

For the plaintiff in error the cause was submitted on the briefs of *Howard B. Eisenberg,* state public defender, and *Jack E. Schairer,* assistant state public defender.

For the defendant in error the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *Maryann S. Calef,* assistant attorney general.

HANLEY, J. Three issues are presented on this appeal:

1. Did the trial court usurp the prosecutorial function during the course of the trial?

2. Was the defendant's statement admissible at trial?

3. Was the evidence sufficient to sustain the verdict?

*Judicial Usurpation of Prosecutorial Functions*

The defendant contends that the trial court coached the prosecuting attorney and otherwise improperly assumed an adversarial role. The defendant lists fourteen incidents to support this argument which are grouped by the state as follows: first, the court's *sua sponte* interrogation of witnesses; second, the court's admonitions in the absence of defense objections; and third, the court's comments and directives in response to defense objections. The examples given by the defendant are fully set forth in his brief at pp. 15–23, and have been reviewed. There is no need to repeat them here.

Recently, in *State v. Asfoor,* 75 Wis.2d 411, 437, 249 N.W.2d 529 (1976) this court stated:

"Sec. 906.14(2), Stats., governs the interrogation of witnesses by a judge. While a judge may question any witness, he must be careful not to function as a partisan or advocate. *State v. Garner,* 54 Wis.2d 100, 104, 194 N.W.2d 649, 651 (1972). '[T]he judge should not take an active role in trying the case for either the state or the defense.' *Id.* In this case the judge took a somewhat active role in questioning witnesses. There is a fine line which divides a judge's proper interrogation of witnesses and interrogation which may appear to a jury as partisanship. A trial judge must be sensitive to this fine line.

*However, the trial judge is more than a mere referee. The judge does have a right to clarify questions and answers and make inquiries where obvious important evidentiary matters are ignored or inadequately covered on behalf of the defendant and the state.* A judge does have some obligation to see to it that justice is done but must do so carefully and in an impartial manner." (Emphasis supplied).

By a similar analysis, this court has on several occasions rejected a defendant's contention that questioning of witnesses by the trial court constituted an impermissible intervention in the adversarial process of the trial. *Willis v. State,* 60 Wis.2d 158, 169–70, 208 N.W.2d 403 (1973); *State v. Garner,* 54 Wis.2d 100, 104, 194 N.W.2d 649 (1972); *Lemerond v. State,* 44 Wis.2d 158, 164, 165, 170 N.W.2d 700 (1969); *State v. Herrington,* 41 Wis.2d 757, 767–68, 165 N.W.2d 120 (1969); *State v. Nutley,* 24 Wis. 2d 527, 561–62, 129 N.W.2d 155 (1964). These cases demonstrate that this court is reluctant to hold that the trial court's involvement in the elicitation of testimony during a trial resulted in such prejudice as to require a new trial.

Moreover, insofar as the defendant's criticism is directed towards the trial court's comments which allegedly nullified defense objections to the elicitation of testimony, it must be remembered that the rules of evidence, upon which the defense objections were based, are intended to provide a system of guidelines by which the truth may be ascertained in a manner which is fair and without unjustified delay. Sec. 901.02, Stats.; sec. 904.03, Stats. Thus, in the final analysis, this court must be convinced that the cumulative effect of the trial court's questioning of witnesses and its general direction of the course of the trial had a substantial prejudicial effect upon the jurors. In this case we are not so convinced.

While the examples cited by the defendant reveal that the trial judge closely moderated the course of this trial, they are not of such a nature as would have a substantial prejudicial impact upon the jury. In those instances where the court interrogated witnesses, nothing in the language or timing of the questions put to the witnesses evidence a motive or purpose other than that of eliciting relevant and, at times, clarifying testimony. In those instances during which the defendant alleges the trial court coached the state's attorney in formulating questions, no inference prejudicial to the defendant is shown. Finally, in those instances where the defendant alleges the trial court impermissibly suggested to the state's attorney how to rephrase a question to which the defense had objected, the trial court attempted merely to expedite the introduction of highly relevant evidence in a manner which would not compromise the defendant's substantive rights.

The court did not comment on any witness' testimony and specifically instructed the jury to disregard any inference as to the guilt or innocence of the defendant which they might draw from his participation in the trial. We are satisfied that on the basis of this record there was no cumulative prejudicial effect warranting a new trial of this case.

*Admissibility of Defendant's Statement*

The defendant challenges the admissibility of the statement given by the defendant to police officers following his arrest. This issue was initially raised by a timely motion to suppress. To determine the merits of the motion, the trial court conducted an evidentiary hearing on November 11, 1975.

Immediately after his arrest, the defendant was conveyed to the emergency room at St. Agnes Hospital in Fond du Lac. Police Officer James F. Thome was pres-

ent when the defendant arrived at the hospital at 9:15 p.m. Officer Thome testified that the doctor in attendance treated the defendant for the ingestion of a large quantity of aspirin, including pumping the defendant's stomach. He stated that after this procedure, the defendant remained in the emergency room until about 11:30 p.m., when he was taken to another room and placed in bed. While the defendant was in the emergency room, the witness stated that he introduced himself as a police officer and engaged the defendant in what the witness characterized as "small talk."

Once the defendant had been removed to his hospital room and placed in bed, Officer Thome testified that he initiated a conversation relating to the events of that day.

Thome testified that he first advised the defendant of his rights from memory and then read him his rights from a written form. Thome also had the defendant read the rights. According to the witness, the defendant acknowledged that he understood these rights, and stated that he did not want an attorney. Thome testified that he asked the defendant if he wanted anyone else present to which the defendant replied, "No." Thome then asked the defendant if he would make a written statement. The defendant agreed, and a written statement in question and answer form was made. The defendant was asked to check the accuracy of the statement and the defendant verified numerous spelling corrections. Thome testified that the defendant signed all eight pages of the statement and initialed the six corrections on its several pages. Thome testified that the defendant appeared to be intelligent and coherent during the questioning, that he made responsive replies to the questions, that the officer did not threaten or use any force on the defendant nor make any promises to the defendant, that the defendant at no time requested that the questioning be terminated, that he never asked for an attorney nor indicated that he

wanted to eat or sleep. Thome further testified that he left the defendant at 1:40 a.m. on October 4th. The witness also stated that the defendant remembered Thome's name when Thome returned to the hospital the following morning to convey the defendant to the Safety Building even though this was the only time he had ever spoken with the defendant.

On cross-examination, Thome stated that he and several other officers had to briefly restrain the defendant while his stomach was being pumped, and that on several occasions the defendant had expressed a wish that he had been left to die.

Officer Robert Tabbert, who was with Thome and defendant throughout this period, testified that he wrote down the statement as the questions were asked and the answers were given. Tabbert's relation of the events surrounding the taking of the statement was substantially in harmony with Thome's.

Detective L. Fred Martin also testified at the hearing. He stated that he had known the defendant for 20 years and that when he first approached the defendant in the emergency room, the defendant recognized him. Martin stated that after being advised of his rights, the defendant specifically stated he did not want to see an attorney. Martin stated that he believed that defendant understood what was happening, and that the defendant was responsive, coherent and alert. Martin further testified that the defendant was as lucid during the night of his arrest as he was when they had a conversation three weeks earlier.

The defendant testified that he had consumed 120 aspirin during the afternoon preceding his arrest. Although he remembered being taken to the hospital, the defendant testified that he was confused, nauseous and dizzy during the night after his arrest and while his statement was being taken. He testified on direct examination that the

statement was not voluntary, but that because he "just didn't really care," he answered the questions put to him. On cross-examination, however, he recalled events which corroborated the testimony of the officers: that Detective Martin introduced Officers Thome and Tabbert to him in the emergency room; that it took about twenty minutes to pump his stomach; that he was told that he could stop the questioning at any time and that he could request an attorney; that he told the officers that he did not want to see anybody; that the officers made him no promises nor threatened him in any way; and that they treated him well. The defendant also acknowledged that he signed the various pages of the statement and that he initialed the corrections.

Dr. John Lent testified with regard to the effects of ingesting large quantities of aspirin. He testified that when large quantities of aspirin are ingested, the salicylate level of the blood rises. (Salicylate is produced by the dissolution of aspirin in water.) The witness further stated that a therapeutic level of salicylate is 20 miligrams per 100 milligrams of blood serum, that a toxic level is reached when the concentration is greater than 30 milligrams per unit, and that a lethal level is achieved when the concentration is between 45 and 60 milligrams per unit. At 9:35 p.m. on the night of the defendant's arrest, an analysis of the defendant's blood was performed and the salicylate level was found to be 48 milligrams per unit. At 2:07 a.m. the following morning, the salicylate level of the defendant's blood was found to be 37 milligrams per unit. Dr. Lent further testified that the usual symptoms resulting from high concentrations of salicylate are as follows:

"The initial symptoms are one tends to over breathe, becomes dizzy, confused, and in the later phases, one gets progressively more confused, and I believe there is a definite impairment of judgment."

Dr. Lent did not treat the defendant on the night he was brought to the hospital, but he testified that it would take 12 hours, depending upon the characteristics of the individual and the concentration of salicylate, to recover. During this time, the doctor stated that a person would be able to converse with others but that the person's ability to make a fine degree of judgment would be impaired. Thus, the doctor opined that a person so afflicted could probably "understand and know if he doesn't want to talk to anyone he doesn't have to," but that he might not be able to make a clear judgment as to whether he wanted a lawyer.

The trial court, after reviewing this evidence, determined that the defendant received and understood his rights, and that he knowingly and intelligently waived those rights in accordance with *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed.2d 694 (1966).

The trial court's determination of whether a statement was taken in observance of the safeguards of *Miranda* and whether the statement was voluntarily made as required by *State ex rel. Goodchild v. Burke*, 27 Wis.2d 244, 264–65, 133 N.W.2d 753 (1965), will not be overturned by this court on review unless the determination is against the great weight and clear preponderance of the evidence. *McAdoo v. State*, 65 Wis.2d 596, 606, 223 N.W. 2d 521 (1974).

At the evidentiary hearing, the burden was upon the state to establish beyond a reasonable doubt that the defendant was informed of his constitutional rights, and that he understood and intelligently waived them. *Micale v. State*, 76 Wis.2d 370, 371, 251 N.W.2d 458 (1977); *State v. Hernandez*, 61 Wis.2d 253, 257, 212 N.W.2d 118 (1973). In *Hernandez, supra*, this court noted that the state, by demonstrating the conditions under which the defendant was informed of his rights and the defendant's

outward appearance in waiving those rights, may establish a "prima facie" case of compliance with *Miranda:*

"We are reluctant to precisely enumerate all of the facts necessary to establish a prima facie showing for all cases because of the variant factual situations that may arise. We do say, however, as a generalization to the *Miranda* question, *that when the state has established that defendant has been told or has read all the rights and admonitions required in Miranda, and the defendant indicates he understands them and is willing to make a statement, a prima facie case* (case is used in the limited sense of the issue at hand) *has been established." State v. Hernandez, supra* at 259. (Emphasis supplied.)

Once such a "case" is made by the state, the defendant must come forward with evidence to contradict the evidence offered by the state or offer additional material and relevant evidence which may affect the finding of ultimate fact. *State v. Hernandez, supra* at 258.

In the instant case, the state made out a prima facie case of compliance with the *Miranda* dictates. For two hours while he was in the emergency room, the defendant was under the observation of the police officers but was not interrogated. At about 11:30 p.m., after the defendant's condition had ceased to be critical, he was taken to another hospital room where the officers repeatedly informed him of his rights. By all outward appearances, the defendant understood these rights and intelligently and knowingly waived them; he was given a *Miranda* waiver form, on which the rights were set forth, and appeared to read it; he signed the waiver; he stated he did not want the presence of an attorney or anybody else; he participated in a discussion of his activities; and he agreed to go over those activities again for the purpose of making a written statement. Throughout this period, the defendant appeared to be coherent, alert and intelligent.

The officers' assessment of the defendant's lucidity and awareness during the events of that evening were in some respects substantiated by the defendant himself. He recollected that he was brought to the hospital shortly after nine o'clock in the evening; that it took about twenty minutes to pump his stomach; that his friend, Detective Martin, introduced Officers Tabbert and Thome to him; that he was taken to another room a couple of hours after his arrival at the hospital; that Thome told him that he did not have to talk to the officers and that he could have an attorney present; that he, without promises or threats, answered Thome's questions; and that he signed and initialed each page and correction of the statement.

The defendant explains his co-operation, however, by stating that he "just didn't care," and that he answered the officers' questions and signed the waiver and statement only because the officers asked him to.

The defendant cites several cases for the proposition that the state must conclusively prove that the defendant's emotional or drugged condition did not affect the defendant's judgment. In *United States v. Brown*, 557 F.2d 541 (6th Cir. 1977), the court of appeals reversed a district court's determination that the defendant's statement was voluntary on the grounds that it was induced by the defendant's overwhelming fear that he would be beaten by police. This result, however, was reached by the court's independent review of the record wherein it was demonstrated that the defendant was young; that the police department placed a high priority on apprehending those who had committed the crime for which the defendant was charged; that the defendant's arrest was violent; and that his confession was made in the back seat of a police car soon after his arrest and after he had been intimidated. *United States v. Brown, supra* at 548–49. The evidence also reflected that the

defendant was sobbing incoherently and emotionally distraught immediately after his arrest, and that he appeared to be severely beaten by the time he was delivered to the police station. *United States v. Brown, supra* at 548–53. In contrast, there is the case of *United States v. Harden*, 480 F.2d 649 (8th Cir. 1973), where, again after an independent review of the evidence, the court affirmed the trial court's determination that the defendant's statement, given while under the influence of a euphoria inducing drug, was voluntary. There, the court stated that it was not willing to say "that a confession made by a person under the influence of drugs is *per se* involuntary," and that under the facts of that case, the statement in question was a product of rational intellect and free will. *United States v. Harden, supra* at 651.

In *State v. Parker*, 55 Wis.2d 131, 197 N.W.2d 742 (1972), cert. denied, 409 U.S. 1110, this court, after a review of the record, concluded that the defendant, who had been wounded during his arrest and was in great fear of his life, had the capacity to make an intelligent, knowing and understanding waiver of his rights under the *Miranda* rule inasmuch as the trial court's findings were not against the great weight and clear preponderance of the evidence. *State v. Parker, supra* at 137–38. Applying this test, as opposed to the independent review procedure used by the federal courts cited above, we conclude that the trial court's determination that this defendant, with intelligence and understanding, waived his *Miranda* rights is not against the great weight and clear preponderance of the evidence.

The defendant also claims that his statement was not voluntarily made in compliance with *State ex rel. Goodchild v. Burke, supra*. In support of this claim, the defendant refers to evidence adduced not at the evidentiary hearing, but rather during the trial. ("Schultz had not

eaten all day. He had wandered around in a woods for part of the day.") Nevertheless, even in light of the fact that the police officers had to briefly restrain the defendant while his stomach was being pumped, the defendant admitted during the hearing that no threats or promises had been made to him, and that the officers had treated him well. Under these circumstances we are satisfied that the trial court's determination that the defendant's statement was voluntary was not against the great weight and clear preponderance of the evidence.

## Sufficiency of the Evidence

The defendant contends that the evidence adduced at trial was insufficient to sustain a conviction for first degree murder. The defendant sets forth three premises to support this contention: that there was no proof that the victim had been murdered; that there was no proof that the defendant actually killed his wife; and that there was insufficient evidence to prove the defendant's intent.

The test for determining whether a verdict of guilty is sustained by the evidence is not whether this court is convinced of the defendant's guilt but whether the jury, acting reasonably, could be so convinced. *State ex rel. Hussong v. Froelich,* 62 Wis.2d 577, 585–86, 215 N.W.2d 390 (1974).

During the trial, Dr. Harry Zemel was called by the state to testify as to the results of the autopsy he performed on the victim. Dr. Zemel stated that the most striking external characteristic of the victim's body was that it was discolored from the middle of the neck to the top of the head. An internal examination, however, revealed nothing extraordinary, he said. No evidence of disease was found. In summary, the doctor testified that the results of the autopsy were "[c]onsistent with, but not diagnostic of, asphyxiation." This meant, the doctor

said, "the absence of oxygen, deprivation of one's oxygen, and the fact that no other disease process to account for her demise [was found.]"

On cross-examination, the doctor testified that none of the neck bones had been broken and that such fractures are frequently a result of a strangulation. However, the doctor did state that it was possible for a person to be strangled without breaking any neck bones. The victim was 68 inches tall and weighed 125 pounds. Moreover, the doctor testified that the discoloration he noted about the victim's neck and head is a finding that is commonly present in people who are deprived of oxygen by one means or another, but that it is not a usual result of a natural death.

We think that the doctor's testimony, together with the defendant's extrajudicial confession of choking his wife and the defendant's testimony that his wife was alive at 2:30 a.m. on October 3 but that she was "cold" an hour later, is sufficient evidence to permit the jury to conclude that the victim had been murdered.

The last two premises upon which the defendant challenges the sufficiency of the evidence—that there was no proof that the defendant killed his wife and there was insufficient evidence of intent to kill—are essentially arguments that there was insufficient evidence beyond the defendant's statement to establish these elements. The defendant cites *Opper v. United States,* 348 U.S. 84, 75 S. Ct. 158, 99 L. Ed. 101 (1954), for the proposition that substantial corroborative evidence, independent of a person's statements, must be introduced to establish the trustworthiness of a statement upon which a conviction largely depends.

However, in *Holt v. State,* 17 Wis.2d 468, 480, 117 N.W.2d 626 (1962), this court rejected this very argu-

ment and in *Triplett v. State*, 65 Wis.2d 365, 372, 222 N.W.2d 689 (1974), the *Holt* rule was again repeated:

"[A]s to the need for corroborating evidence, all the elements of the crime do not have to be proved independently of the accused's confession—it is enough that there be some corroboration of the confession in order to sustain the conviction. As this court has put it, '. . . The corroboration, however, can be far less than is necessary to establish the crime independently of the confession. If there is corroboration of any significant fact, that is sufficient under the Wisconsin test.' " *See also, Jackson v. State*, 29 Wis.2d 225, 231–32, 138 N.W.2d 260 (1965); *Barth v. State*, 26 Wis.2d 466, 468, 132 N.W.2d 578 (1965).

At the trial, the defendant denied killing his wife. He testified that he woke up about 2:00 a.m. to 2:30 a.m. on October 3 to work on logs and paper work relating to his employment. He got up, had breakfast, and then went back to bed, resetting his alarm for 3:30 a.m. The alarm went off and he got up a second time. This time, he noticed his wife was cold. The defendant claimed he panicked and disconnected the phone so that his children would not be awakened until someone came. He stated he then wrote letters to his father-and mother-in-law, his brother, and his niece and her husband. He stated he left the house, dropped off some paper work at his employer's office and then bought some aspirin. He stated he drove south on Highway 41 and called the police from a gasoline station. He thereupon proceeded further south until he reached a wayside rest area where he took the aspirin.

Other evidence adduced at trial corroborated the defendant's version of the events of that day except, of course, his actions after awakening in the morning. A different version of these events was brought forth at trial when the defendant's statement was read, part of which read as follows:

"Q. When you found out she was going to serve [divorce] papers, what did you plan on doing?

"A. Nothing at that time.

"Q. When did you make the decision to kill her?

"A. On Wednesday, I knew I had to do it. I was not going to lose the kids.

"Q. You said do it, what did you mean by that?

"A. She was going to . . . kids away from me, and I felt I was going to kill her for it. . . .

"Q. When you went to bed last night, did you know you were going to kill her?

"A. Not really, but I still knew I had to do it. I was going to wait later.

"Q. What time did you get up?

"A. I got up at 2:30 a.m. on the 3rd of October, 1975. I wrote some letters until 3:30 a.m., then I started disconnecting the telephone wires because my boss usually calls me around 4:00 a.m.

"Q. Why were you afraid your boss would call you?

"A. I was afraid I would be busy at the time. I didn't want anybody disturbing me.

"Q. Busy doing what, Harvey?

"A. Murder I would imagine.

"Q. What did you do after you disconnected the phone wires?

"A. I went up and started. She never struggled. It was over in a moment.

"Q. What did you start, Harvey?

"A. I choked her with both of my hands . . ."

Evidence independent of this statement was brought forth at trial to corroborate this version of the events. Of particular importance was the defendant's own testimony. On cross-examination, the defendant testified that the police had been to their home three weeks before these events to quell a marital disturbance during which the defendant struck his wife. He also stated his wife had served divorce papers on him. The defendant admitted on cross-examination that he wrote a letter to his father- and mother-in-law in which he stated "Due to all the things you are trying to pull me and Mary apart for years, you finally did so. In return, I am going do a small better small better and am going to hurt you a small more. [sic]. I will take a life from you and give her to God."

The defendant also testified at trial that when he arrived at the tavern in Lomira, he looked at that day's newspaper, saw a picture of his home on the front page and thought "I'd better turn myself in."

We conclude that under all the facts of this case, there was sufficient evidence independent of the defendant's statement to corroborate the statement with respect to the defendant's intent to kill his wife and his actions resulting in her death. We further hold that upon this evidence, the jury, acting reasonably, could conclude that the defendant was guilty of first degree murder.

*By the Court.*—Judgment and order affirmed.