STATE of Wisconsin,
Plaintiff-Respondent,†

v.

Edward BANNISTER,
Defendant-Appellant.

Court of Appeals

*No. 2005AP767–CR. Oral argument April 11, 2006.
—Decided May 23, 2006.*

## 2006 WI App 136

(Also reported in 720 N.W.2d 498.)

† Petition to review granted 9-12-06.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Kenneth P. Casey, Craig S. Powell* and *Jenny Yuan* of the Criminal Appeals Project – Frank J. Remington Center, University of Wisconsin Law School, Madison, with oral argument by *Kenneth P. Casey*.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Peggy A. Lautenschlager,*

360

attorney general, and *Christopher G. Wren*, assistant attorney general, with oral argument by *Christopher G. Wren*.

Before Wedemeyer, P.J., Fine and Curley, JJ.

¶ 1. CURLEY, J. Edward J. Bannister appeals the judgment convicting him of one count of delivery of a controlled substance, morphine, contrary to WIS. STAT. §§ 961.14(3) and 961.41(1)(a) (2003–04).[1] Bannister argues that there was insufficient evidence to convict him because his confession was not corroborated by a significant fact. In addition, he alleges that several improprieties at trial prohibited the real controversy from being tried, and he is entitled to a discretionary reversal pursuant to WIS. STAT. § 752.35. Because the State failed to corroborate a significant fact of Bannister's confession, we reverse.[2]

## I. BACKGROUND.

¶ 2. On January 17, 2003, the City of Cudahy police were dispatched to the home of Michael Wolk. Upon their arrival, they discovered that Wolk, who was lying on the loveseat, was dead. Drug paraphernalia consisting of two syringes, a teaspoon, rolling papers, and a small white powdery rock substance were found on a nearby table. Later testing revealed morphine on the two syringes and teaspoon, and an autopsy of Wolk

[1] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

[2] Because of our disposition of this first issue, it is not necessary for us to address the remaining arguments. *See Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663 (1938) (only dispositive issues need be addressed).

discovered that the cause of death was morphine toxicity. However, no morphine pills were found.

¶ 3. An investigation eventually led police to Bannister after they interviewed Wolk's brother, Steven, who told the police that both he and his brother had obtained morphine from Bannister. Steven Wolk gave the police inconsistent statements concerning the length of time this occurred. Steven also told the police he had a short-term memory deficit. Bannister was arrested and originally charged with delivering a controlled substance, morphine, to Michael Wolk, and first-degree reckless homicide. Some nine months after Wolk's death, Bannister was arrested and taken to the Cudahy police station, where he was given food after he informed the police that he suffers from sickle cell anemia. After being advised of his *Miranda* rights,[3] Bannister told the detective that he gave morphine tablets to Steven or Michael Wolk eight to ten times between mid-December 2002 to mid-January 2003. The detective who interrogated Bannister later testified that he took notes of what Bannister said and transcribed his notes into a report. However, Bannister never saw the notes or signed the confession, and the notes were destroyed after the report was completed.[4]

¶ 4. Bannister waived his preliminary hearing and demanded a jury trial. On the first day of trial, the State announced that it planned to proceed only on the delivery of morphine charge. However, after Bannister's defense attorney suggested that any discussion of Wolk's death was unduly prejudicial, and the State responded by stating that it was prepared to proceed

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[4] The transcript notes that the report was introduced into evidence as an exhibit. However, no exhibits are in the record.

with the homicide charge, Bannister entered into a stipulation that, in exchange for not having to face the charge of reckless homicide, he would permit the State to introduce evidence that Wolk died as a result of a morphine overdose. Prior to the calling of witnesses, the trial court conducted a *Miranda-Goodchild*[5] hearing and ruled that Bannister's confession was admissible.

¶ 5. During the State's opening statement to the jury, the prosecutor told the jury that "the purpose of the testimony regarding the death is not [sic] ask someone to answer for that death, but it's an important element of evidence that I think that you have to listen to." He also advised the jury that they may hear from Steven Wolk, and that his testimony would be that he and his brother Michael were either given or they purchased morphine tablets from Bannister over the span of several months, and that the last time they obtained morphine from Bannister was a couple of days before Michael's death either January 14th or 15th, 2003. However, when Steven Wolk was brought to the courtroom from prison (he had recently been convicted of a traffic homicide charge), he indicated under oath and outside the presence of the jury that he would not testify even if the State offered him immunity. As a result, the jury never heard any direct testimony from Steven Wolk.

¶ 6. Several other witnesses were called by the State. The police officer responding to the 911 call described what he observed at the Wolk residence. A laboratory technician and the medical examiner testified that morphine had been found on the drug para-

---

[5] *State ex rel. Goodchild v. Burke*, 27 Wis. 2d 244, 133 N.W.2d 753 (1965).

phernalia near Michael Wolk's body, and that Michael Wolk died of morphine toxicity. The Cudahy police detective also testified about Bannister's confession. After the close of testimony at the jury instruction conference, Bannister's attorney advised the court that Steven Wolk did not testify because the prosecutor in his opening statement indicated that Steven Wolk would testify that Bannister had given them morphine pills. The trial court ruled that Bannister's attorney could not mention that Steven Wolk had not testified, because to do so would require the jury to know that Steven Wolk exercised his constitutional rights not to incriminate himself.

¶ 7. Bannister was subsequently convicted and sentenced to five years of confinement with three years of extended supervision to follow. At sentencing, the State asked the trial court, at the behest of Michael Wolk's widow,[6] to order Bannister to pay restitution of approximately $4000[7] for Wolk's funeral expenses. The trial court agreed, and ordered Bannister to pay the funeral expenses as restitution. A postconviction motion was filed seeking a new trial. It was denied and this appeal follows.

## II. ANALYSIS.

¶ 8. Bannister first argues that there was insufficient evidence to sustain the conviction because his

---

[6] This is contrary to the State's earlier position in opening statements that the State was not suggesting that the morphine that killed Wolk was the same morphine delivered by Bannister.

[7] The judgment reflects that $4007 is owed for restitution; however, the transcript for the sentencing hearing indicates $4700. In light of the reversal, any money that Bannister has paid towards restitution should be returned to him.

confession was not corroborated by any significant fact. The State maintains that the discovery of morphine in Wolk's body constitutes corroboration of a significant fact. We have carefully scrutinized the testimony in this case. After doing so, we must conclude that, under the unusual facts presented here, the presence of morphine in Michael Wolk's body does not constitute "corroboration of a significant fact" as is required by law.

¶ 9. Developed at common law, Wisconsin's corroboration rule, also known as the *corpus delicti* rule, requires that a "conviction of a crime may not be grounded on the admission or confessions of the accused alone." *State v. Verhasselt*, 83 Wis. 2d 647, 661, 266 N.W.2d 342 (1978). Instead, there must be corroboration of a "significant fact." *Holt v. State*, 17 Wis. 2d 468, 480, 117 N.W.2d 626 (1962). The corroboration rule ensures the reliability of the confession. *See Verhasselt*, 83 Wis. 2d at 662. "[T]he main concern behind the corroboration rule is that an accused will feel 'coerced or induced' when he or she 'is under the pressure of a police investigation' and make a false confession as a result." *State v. Hauk*, 2002 WI App 226, ¶ 25, 257 Wis. 2d 579, 652 N.W.2d 393 (footnote omitted). "Such corroboration is required in order to produce a confidence in the truth of the confession." *Holt*, 17 Wis. 2d at 480. As noted, the corroboration must be of a "significant fact" before the conviction can stand. *Schultz v. State*, 82 Wis. 2d 737, 753, 264 N.W.2d 245 (1978). While no case law defines exactly what a "significant fact" is, the dictionary defines "significant" as "having or likely to have influence or effect: important." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 1096 (1991). We independently review whether the evidence presented meets

the corroboration standard. *See Barth v. State*, 26 Wis. 2d 466, 468, 132 N.W.2d 578 (1965).

¶ 10. We first observe that there is a dearth of information in the charging portion of the complaint concerning the charge against Bannister. It alleges only that Bannister delivered morphine at his residence "[o]n or about or between December 15, 2002 to January 17, 2003," a thirty-four-day span. No trial testimony explored or elaborated on this delivery. No eyewitnesses to the exchanges testified, and no other details fleshing out the facts of the delivery such as what time of day it occurred, what room the parties were in when the exchange occurred, or how the visit was set up was ever presented. The only evidence admitted at trial concerning these events was Bannister's rather generic confession that the deliveries occurred at his home. Like the charging portion of the complaint, Bannister's statement is also devoid of detail. Bannister told the detective little about the circumstances surrounding the delivery; he never mentioned what time of day the parties would meet, what the parties said, how they communicated, etc. We have only Bannister's barebones confession that at his house he gave morphine pills to Michael Wolk on three or four occasions, and to Steven Wolk on three or four occasions within the span of about one month.

¶ 11. The detective, who knew at the time of the interrogation that Wolk had died of a morphine overdose, testified that: "He told me that he gave morphine to Steve on three to four occasions and to his brother Michael on three to four occasions. I believe he said approximately every third day or in that range."[8] In

---

[8] This is the most specific testimony that the officer gave regarding the number of visits of the two men. At other times the officer stated that Bannister told him that he delivered

other words, Bannister confessed to giving Michael Wolk morphine pills three to four times over the span of thirty-four days. If, as the detective related, Bannister gave Michael Wolk the morphine pills three to four times approximately every third day, depending on when he started and stopped, the deliveries to Michael could have been easily concluded by mid-December. Thus, under this scenario, it would be extremely unlikely that any morphine found in Wolk's body on January 17, 2003, was obtained from Bannister unless Wolk saved some, and thus, does not corroborate the confession. Even if we assume that the deliveries occurred nearer to the time of Wolk's death, as was suggested by the prosecutor in his opening statement, when he claimed the last morphine exchange occurred two days before Wolk's death, the evidence of morphine in Wolk's body is not a significant fact corroborating Bannister's confession that he gave morphine pills to Wolk, it corroborates only that Wolk used morphine. This is so because Michael Wolk was a drug addict who regularly used illicit drugs. Consequently, the finding of morphine in his body was not a remarkable or important discovery. Just as a diabetic would have traces of insulin in the bloodstream, evidence of morphine would be expected in the bodies of morphine addicts.[9] A significant fact is a meaningful and particularized fact that produces confidence in the truthfulness of the confession. Based on the evidence produced at trial, the finding of morphine in Wolk's body was not a significant

morphine to either Steven or Michael Wolk eight to ten times, about every third day within the thirty-four-day span.

[9] This is not to equate diabetes with morphine addiction. The comparison was used only to explain that people who regularly take medications can be expected to test positive for those drugs.

fact corroborating Bannister's confession. Here, no other facts or circumstances supporting Bannister's confession were ever produced. No morphine pills or evidence of morphine pills were found next to Wolk's body, and the expert witnesses were unable to pinpoint the source of the morphine. No independent eyewitness testified to any drug exchanges between Bannister and the Wolks. Further, Bannister's confession did not yield any unusual information or circumstances that would not be widely known. Thus, under the circumstances present here, without additional evidence, the finding of morphine in Michael Wolk's morphine-addicted body is not sufficient to corroborate Bannister's confession claiming to have given morphine pills on prior uncertain dates to the deceased.

¶ 12. Inasmuch as the lack of corroboration of the confession presents the very situation that the corroboration rule was designed to prevent; that is, the possibility that the confession could have been false, the corroboration rule was not met. Accordingly, the evidence was insufficient to convict Bannister. Consequently, we reverse the conviction and remand this matter to the trial court for further proceedings.

*By the Court.*—Judgment reversed and cause remanded with directions.

¶ 13. FINE, J. (*concurring*). I join fully in the Majority Opinion, but write separately to discuss two matters to which the Majority alludes: (1) the prosecutor's extortion of Edward Bannister's agreement to let the jury know that Michael Wolk died from an overdose of morphine, and (2) the prosecutor's basing his opening statement in part on Steven Wolk's projected testimony when on this Record there is nothing to show that the prosecutor had a good-faith basis to believe that

Steven Wolk would not claim his Fifth Amendment privilege to not testify. I discuss these in turn.

(1) *Michael Wolk's death.*

¶ 14. As the Majority notes, although the State originally charged Edward Bannister with unlawful delivery of morphine, *see* WIS. STAT. §§ 961.14(3) & 961.41(1)(a), and first-degree reckless homicide, *see* WIS. STAT. § 940.02(2) (death resulting from the unlawful delivery of a controlled substance), on the morning of the first trial day, the prosecutor said that he would not pursue the homicide charge if Bannister agreed that the prosecutor could let the jury know that Michael Wolk died from a morphine overdose. Bannister's lawyer objected, and noted that the lead prosecutor had told him earlier that the State did not believe it had sufficient evidence to prove the reckless-homicide charge, and that the threat to file an amended information charging only first-degree reckless homicide was thus, as phrased by Bannister's lawyer, "just an end run attempt" to get the evidence of death before the jury. When the trial court said that it would permit the prosecutor to file a single-count amended information charging Bannister with first-degree reckless homicide, Bannister decided to let the prosecutor tell the jury that Michael Wolk died from a morphine overdose.

¶ 15. Later, in his opening statement to the jury, the prosecutor emphasized Michael Wolk's overdose death, relating how Wolk's wife found him dead in their living room:

> And the purpose of the testimony regarding the death is not [*sic*] ask someone to answer for that death, but it's an important element of evidence that I think that you have to listen to. So although it may be painful to listen to it, it may not be the nicest evidence you'll

369

hear. It's important. It's important because his wife found him, what ends up, being dead.

The prosecutor then told the jury that the Milwaukee medical examiner and a toxicologist working in his office would testify that Michael Wolk died on January 17, 2003, from an overdose of morphine that he ingested either that day or the night before, but that the prosecutor was "not asking" the jury "to make a determination who is at fault for Michael Wolk's death. I don't know who is at fault for that death. *I know* who is at fault for giving him, several days before, some morphine and selling it to him, and that's this defendant right here." (Emphasis added.) In my view, all of this was highly improper.

¶ 16. First, a lawyer may *never* tell a jury what the lawyer *knows* about the contested issues in a case. Supreme Court Rule 20:3.4 is not only explicit: "A lawyer shall not: ... **(e)** in trial, ... assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, ... or the guilt ... of an accused," but, indeed, this is law-school 101. Frankly, it is shocking that this lawyer, Milwaukee County assistant district attorney Denis Stingl, apparently did not know that, or, if he did know it, ignored the proscription nevertheless. But that is not all.

> [A prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But,

370

while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States*, 295 U.S. 78, 88 (1935). Although as contended by the State in oral argument on this appeal, Michael Wolk's death from a morphine overdose was evidence of his recent ingestion of morphine (while the traces found in his house could have been left there at almost any time), that fact was not relevant because Bannister's confession (the only "evidence" tying Bannister to morphine in Michael Wolk's house) encompassed mid-December 2002 to mid-January 2003, and the morphine that caused Michael Wolk's death could have been gotten by him at any time—even before December of 2002. In any event, the solution was to ask for an agreement that Michael Wolk possessed morphine in mid-January 2003 without telling the jury that he died as a result. Waving the "bloody shirt" of Wolk's overdose death invited—in the most blatant way—the jury to consider the evidence as proving that, beyond the delivery-charge, Bannister was also guilty of homicide.[1] Thus, the prosecutor's "warning" to the jury that "the purpose of the testimony regarding the death is not [*sic*] ask someone to answer for that death, but it's an important element of evidence that I think that you have to listen to" was disingenuous

---

[1] According to the Wikipedia online encyclopedia: "The term 'bloody shirt' can be traced back to the aftermath of the murder of the third Caliph, Uthman in 656 CE, when a bloody shirt and some hair alleged to be from his beard were used in what is widely regarded as a cynical ploy to gain support for revenge against opponents." Wikipedia, http://en.wikipedia.org/wiki/Bloody_shirt.

and not befitting the important role *for justice* that prosecutors have in our system. Indeed, it is a perfect example of the apophasis rhetorical device—arguing something by disclaiming an attempt to so argue. The prosecutor's opening-statement dance was, as Justice Felix Frankfurter noted in a somewhat related context, akin to "the Mark Twain story of the little boy who was told to stand in a corner and not to think of a white elephant." *Leviton v. United States*, 343 U.S. 946, 948 (1952) (mem. of Frankfurter, J.).

(2) *Steven Wolk's non-testimony.*

¶ 17. As the Majority recounts, the prosecutor told the jury that Steven Wolk, Michael Wolk's brother, would testify that they both got morphine from Bannister in mid-January:

> I'm asking, for instance, *if Steven [Wolk] should testify,* you listen to him and you weigh his evidence and you weigh his credibility. It'll be out there for you. You may find he's a distasteful individual. He's a drug user. His brother was a drug user. Drugs killed his brother. You'll hear— it'll be clear that Steven Wolk isn't the nicest person in the world but he's a witness to what happened.
>
> He'll tell you that over a span of time, that he and his brother, together with Steven, would obtain morphine from the defendant, Edward Bannister. It went on for about a year. They would go to Edward Bannister's home and obtain it. Sometimes, Edward Bannister would give it to him, according to Steven. *I don't know if that's true*— but one thing, you have to weigh everything— would give it to him free of charge. Sometimes, he'd give him some good faith money. That on or about the 14th or 15th of January, he can't remember the exact day, sometime in late morning or early afternoon, Steven Wolk, Michael Wolk went to the

defendant's home and the defendant gave them two tablets of morphine, that they in turn gave the defendant $20.00 in exchange for that, and that Steven took one pill and Michael took another one of the pills so that they could use it at a later date or later time.

(Emphasis added.)

¶ 18. Steven Wolk never testified. Rather, when he was ostensibly supposed to testify, he and his lawyer told the trial court that Steven Wolk would invoke his Fifth Amendment privilege to not testify. When Bannister's lawyer asked the trial court whether he could refer in his closing argument to the fact that despite the prosecutor's assertions in his opening statement about what Steven Wolk would tell the jury, the State never produced Steven Wolk to the jury, the prosecutor complained that that would be unfair because, among other things, "I mentioned him as a *potential* witness. You will *maybe* hear from him or about him." (Emphasis added.)

¶ 19. The trial court ruled that not only could Bannister's lawyer not tell the jury that Steven Wolk asserted his Fifth Amendment privilege, *see* WIS. STAT. RULE 905.13(1) (In criminal cases, "[t]he claim of a privilege, whether in the present proceeding or upon a prior occasion, is not a proper subject of comment by judge or counsel."), but, also, and this is the crux, forbade Bannister's lawyer from arguing that the prosecutor did not keep his promise about what Steven Wolk would testify, ruling: "I don't think you should reference him as failing to be a reference [*sic*]."[2] In my view, this was error.

---

[2] Most likely the trial court said "witness" but this was mistranscribed as "reference."

¶ 20. A prosecutor's use of non-evidence (such as assertions in an opening statement or, under some circumstances, questions) to sway a jury, can deny a defendant his or her right to confrontation when those assertions are not backed by evidence produced at trial. *Douglas v. Alabama*, 380 U.S. 415, 418–420 (1965) (defendant denied right to confrontation when prosecutor's statements and questions, although "not technically testimony," were the equivalent in the jury's eyes, thus triggering the right to confront). Of course, not every opening-statement promise of proof that is not validated by evidence is a prejudicial denial of the confrontation right. *See Frazier v. Cupp*, 394 U.S. 731, 733–737 (1969) (*de minimis* effect on trial and prosecutor's good faith belief that evidence could be produced) ("Certainly not every variance between the advance description and the actual presentation constitutes reversible error, when a proper limiting instruction has been given."). There is nothing in the Record here, unlike the situation in *Frazier*, 394 U.S. at 733, that indicates that the prosecutor in this case tried to determine ahead of time that Steven Wolk would testify and that the prosecutor was misled by Steven Wolk's last-minute change of heart. Indeed, when the trial court prevented him from telling the jury that Steven Wolk did not testify, Bannister's lawyer pointed out that whether Steven Wolk would or would not testify "could have been asked of him a long time ago." The trial court, however, excused the prosecutor's failure to find out if Steven Wolk would testify by noting that Steven Wolk was in prison. The prosecutor, tacitly admitting that he did not bother to find out, replied that any assurance Steven Wolk could have given him would have been transitory because "he can change his mind up to the very moment."

¶ 21. Further, and working synergistically with the defendant's right to confront his or her accusers, is the rule that no party, especially a prosecutor in a criminal case, may promise to prove something that he or she knows, or reasonably should know, cannot be proven by evidence at trial. *See* ABA Standards for Criminal Justice: Prosecution Function and Defense Function, Standard 3–5.5 Opening Statement (3d ed. 1993) ("The prosecutor's opening statement should be confined to a statement of the issues in the case and the evidence the prosecutor intends to offer which *the prosecutor believes in good faith will be available and admissible.* A prosecutor should not allude to any evidence unless there is a good faith and reasonable basis for believing that such evidence will be tendered and admitted in evidence.") (emphasis added).

¶ 22. It is no answer to say that the trial court told the jury that the lawyers' arguments were "not evidence"—the jury heard the prosecutor's version of what Steven Wolk would tell them, and that went unrebutted when the trial court refused to allow the defense lawyer to even remind the jury that it was a prosecutorial promise not kept. Indeed, as we have already seen, the prosecutor also improperly told the jury that he "knew" that Bannister had given morphine to Michael Wolk "several days before" Wolk's death on January 17, and that was the precise piece of the puzzle that the prosecutor promised the jury would be supplied by Steven Wolk.

¶ 23. We indulge the presumption that juries follow instructions because that advances the goals of finality. If we did not, we'd be trying the same case over and over again—the jurisprudential equivalent of a structure drawn by Maurits C. Escher. Yet, we must not let this general rule blind us to the rare situation when

the trial court's instructions do not cure the prejudice. As Learned Hand repeatedly warned, the efficacy of the instructions are more assumed than real. *See United States v. Delli Paoli*, 229 F.2d 319, 321 (2d Cir. 1956) ("Possibly it would be extreme to say that nobody can ever so far control his reasoning that he will not in some measure base his conclusion upon a part of the relevant evidence before him, which he has been told to disregard; but at least it is true that relatively few persons have any such power, involving as it does a violence to all our habitual ways of thinking."), *aff'd,* 352 U.S. 232; *Nash v. United States,* 54 F.2d 1006, 1007 (2d Cir. 1932) (Instruction to jury to ignore prejudicial evidence often requires them to perform "a mental gymnastic which is beyond, not only their powers, but anybody's else."), *cert. denied,* 285 U.S. 556. Here, Steven Wolk's projected testimony was the key link tying Bannister to the delivery of *any* morphine to Michael Wolk, no less the delivery of morphine to Michael Wolk several days or so before January 17.

(3) *Conclusion.*

¶ 24. If the prosecutor believed he could prove that Bannister had given Michael Wolk the morphine that caused Michael Wolk's death, he should have stayed with the first-degree-reckless-homicide charge and let the jury decide Bannister's guilt or innocence on that charge. If the prosecutor did not believe that he could prove that Bannister had given Michael Wolk the morphine that caused Michael Wolk's death, then his back-door use of the death-evidence was improper. Further, any lawyer, especially prosecutors, whose jobs are, as we have discussed, to seek *justice* and not merely convictions, should never promise in their opening statements to prove something unless they are certain

that the evidence is both available and admissible. Trial judges, as impartial arbiters of justice, must ensure that this is done, and use appropriate judicial power if it is not. Additionally, institutional law offices, such as the district attorney's office, have a special responsibility to ensure that the lawyers they send into court follow the simple rules of evidence, ethics, and fairness. Sadly, none of this was done here.